124 T.C. No. 16


UNITED STATES TAX COURT


CHARLES F. AND SUSAN G. GLASS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17878-99.               Filed May 25, 2005.


        L is a longstanding nonprofit nature conservancy,
the tax-exempt purposes of which include the
preservation of wildlife, plants, and natural land on
or near the shoreline of Lake Michigan.  Ps own
approximately 10 acres of land (property) that includes
a high undeveloped bluff on 460 feet of that shoreline.
Bald eagles commonly frequent the bluff.  In addition,
dense vegetation grows naturally on the bluff.  That
vegetation includes a species of plant, Lake Huron
tansy, that is considered to be threatened.  The
natural values of the bluff also allow it to create or
promote a possible habitat for pitcher's thistle,
another species of plant that is considered to be
threatened and that is found on the Lake Michigan
shoreline.  Ps made contributions to L of two
conservation easements (conservation easements) in
perpetuity that generally preclude them or any
subsequent owner of the property from ever developing
or disturbing the natural state of much of the bluff.
Ps contributed the first easement in 1992 and the

second in 1993. Ps claimed on their 1992 and 1993
Federal income tax returns that the contributions were
qualified conservation contributions under sec.
170(h)(1), I.R.C. R concedes that the contributions
meet two of the three requirements for such a
characterization; i.e., the portions of the bluff
covered by the conservation easements are each a
"qualified real property interest" and L is a
"qualified organization". R asserts that the
contributions fail the third requirement, that they be
"exclusively for conservation purposes".

Held: Each of the contributions is a qualified
conservation contribution under sec. 170(h)(1), I.R.C.,
in that (1) the conservation easements protect a
relatively natural habitat of plants or wildlife as
required by sec. 170(h)(4)(A)(ii), I.R.C., and (2) L
(or any subsequent holder of the conservation
easements) holds (or will hold) the conservation
easements exclusively for conservation purposes as
required by sec. 170(h)(5), I.R.C.

Charles F. Glass and Susan G. Glass, pro sese.[1]

Alexandra E. Nicholaides, for respondent.

LARO, Judge: Petitioners petitioned the Court to
redetermine deficiencies of $26,539, $40,175, $26,193, and
$22,771 in their Federal income taxes for 1992, 1993, 1994, and
1995, respectively. We decide whether petitioners' respective
contributions in 1992 and 1993 of two conservation easements
(collectively, conservation easements; separately, conservation

---

[1] William B. Acker petitioned the Court on behalf of
petitioners and continued to represent them until he withdrew on
Mar. 25, 2002.

easement 1 and conservation easement 2) were qualified conservation contributions under section 170(h)(1).[2]  We hold they were.  Petitioners claimed on their 1992 and 1993 Federal income tax returns (1992 return and 1993 return, respectively) that their contributions of the conservation easements were qualified conservation contributions.  As further support for his disallowance of those claims, respondent in his posttrial brief argues for the first time that petitioners have not proven that they met the "contemporaneous written acknowledgment" requirement of section 170(f)(8).  We consider this position to have been advanced untimely and do not decide it.  See Leahy v. Commissioner, 87 T.C. 56, 64-65 (1986).

## FINDINGS OF FACT

I.  Background

Some facts were stipulated.  We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith.  We find the stipulated facts accordingly. Petitioners are husband and wife, and they filed a joint Federal income tax return for each relevant year.  They resided in Emmet County, Michigan (Emmet County), when their petition was filed.

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years, and Rule references are to the Tax Court Rules of Practice and Procedure. The relevant provisions of sec. 170(h) are set forth in an appendix to this Opinion.

Emmet County is on the northern lower peninsula of Michigan and has 50 or more miles of shoreline on Lake Michigan.

II. Petitioners

A. Charles F. Glass (Mr. Glass)

Mr. Glass is a lawyer who has practiced law in Michigan since 1969. His legal specialties are real estate, medical malpractice defense, and employment and family and domestic matters.

B. Susan G. Glass (Ms. Glass)

Ms. Glass has a bachelor of arts degree in English and a master's degree in art. She also has a real estate license. She has worked as a copywriter and as an artist.

III. The Property

A. Petitioners' Purchase of the Property

On August 17, 1988, petitioners purchased property (property) at 3445 North Lakeshore Drive, Harbor Springs, Michigan (Harbor Springs), for $283,000. The property is sited along the shoreline of Lake Michigan in northern Emmet County and includes three buildings and approximately 10 acres of land. Although the property's address is listed as in Harbor Springs, the property is actually outside Harbor Springs in the Township of Readmond, Michigan (Readmond), approximately 2-1/2 miles north of Good Hart, Michigan, and 3-1/2 miles south of the Township of Cross Village, Michigan (Cross Village).

B.  Petitioners' Use of the Property

Petitioners used the property as a vacation home until 1994, when they began using the property as their primary residence. During 1992 and 1993, they resided in Grosse Point Farms, Michigan.  During part of 1994 and all of 1995, they used their residence in Grosse Point Farms as a secondary residence to the property.  From 1995 through 1999, they lived part time at the property and part time in Detroit, Michigan; they continued during those years to use the property as their primary residence.  In 1999 or 2000, they began living entirely at the property.

C.  Buildings on the Property

The property has had the same three buildings on it since 1988.  The first building is a single-story small handcrafted cabin that is made of hand-hewn logs and elm bark shaving.  This cabin is approximately 1,278 square feet and is used by petitioners as their home.  The second building is a single-story guest cottage that is approximately 512 square feet.  The third building is a single-story garage that is approximately 525 square feet.

D.  Description of the Property

The property's dimensions are generally 460 feet in width from north to south and 1,055 feet in depth from east to west. Its eastern edge is a straight line bordering Highway M-119

(M-119).[3]  Its western edge is a crooked line abutting Lake

Michigan.  Lake Michigan cannot be seen through the property from

M-119 because many large trees and dense foliage grow throughout

much of the property.  Included among the trees on the property

is a plantation of large (approximately 100-foot) old growth

original white pine trees.

A portion of the property that generally includes the

property's total width and extends approximately 900 feet from

M-119 is relatively flat and is generally open, grassy, and well

lawned around petitioners' home and wooded and bushy in other

places, especially along M-119.  The rest of the property

(approximately 155 feet in depth and 460 feet in width) slopes

down a steep bluff at an angle of about 100 degrees to the

shoreline of Lake Michigan or, more specifically, to Lake

Michigan's ordinary high water mark.[4]  The bluff is approximately

100 feet high, and a stairway goes down it to the shoreline.  The

shoreline is level and consists of rocks, sand, grass, and weeds.

---

[3] M-119 is a blacktop highway from Harbor Springs to Cross
Village that is called the "tunnel of trees" because of its
narrowness and the degree of growth near its shoulderless edges.
The side of M-119 closest to Lake Michigan has primarily
residential dwellings ranging in style from basic summer cottages
to elaborate year-round homes.  The opposite side of M-119 has
undeveloped land.

[4] Lake Michigan's high water mark is 582.35 feet above sea
level.  The U.S. Army Corps of Engineers set Lake Michigan's
ordinary high water mark at approximately 581 feet above sea
level.

The side of the bluff contains many trees (e.g., white pine, cedar, spruce, oak, maple, balsam fir) and dense vegetation (e.g., juniper bushes and other shrubs).

Petitioners' home on the property is sited on relatively flat land on the top of the bluff approximately 45 to 50 feet from the edge at the top of the bluff. On a clear day, a beautiful panoramic view of Lake Michigan may be seen from the home and from a further distance of at least 50 more feet towards M-119. Petitioners have chairs at the top of the bluff to enjoy that view and to socialize.

Species of plants that grow on the Lake Michigan shoreline in northern Emmet County include Lake Huron tansy and pitcher's thistle. These plants are considered to be threatened and require undisturbed habitats to survive. Birds on that shoreline include bald eagles, piping plovers, and kingfishers. Other wildlife in the area includes deer, bears, and raccoons.

In the early 1990s, bald eagles were returning to the Lake Michigan shoreline on and near the property, and the presence of bald eagles along that shoreline is more common today than in earlier years, when it was unusual to see an eagle on that shoreline. An exceptionally old and high tree on the top of the bluff of the property covered by conservation easement 1 (the highest tree on the bluff for some miles) is an occasional roosting site for at least one bald eagle. The property also has

attracted kingfishers and has Lake Huron tansy growing on it, especially on the bluff. The property is not an ideal habitat for Lake Huron tansy or pitcher's thistle, another threatened species of plant, but the property, in its natural state, allows for the creation or promotion of the habitat of those species as well as the habitat of bald eagles and piping plovers.

E.   Surroundings of the Property

The Lake Michigan shoreline from north of Harbor Springs to Cross Village is generally developed only for residential and related purposes. Most of that shoreline is privately owned with single family vacation homes. Approximately one home is sited on that shoreline every 250 feet in the half mile north of the property and in the half mile south of the property; i.e., approximately 21 homes are in the immediate 1-mile vicinity of the property.

The typical use of the land in the immediate vicinity of the property is for single-family dwellings. Petitioners' neighbors to the north, for example, built a large home on two parcels of land that cover approximately 400 feet of lakefront. A number of high density developments with either lakefront or back lots are also found on the land in the immediate vicinity of the property. For example, the Sequoia Yacht Club, which is approximately 1 to 2 miles south of the property, is a platted subdivision which was developed on 300 feet of lake frontage and 1,000 feet of depth

and includes 3 lakefront lots and 19 or 20 back lots. Mr. Glass assisted in the development of the Sequoia Yacht Club on the underlying real estate which, unlike the property, has a large area between the bluff and the water upon which to build. Other nearby densely platted developments, e.g., Blisswood and Old Trial Inn, both of which are approximately one-half mile from the property, also consist of lakefront lots and back lots. Such developments are not the norm in the area of the property; single family homes and cottages are.

The nearest public access to the shoreline on the property is approximately 1.5 miles to the south at Readmond Township Park in Readmond.[5] Readmond is approximately 40 square miles, is approximately 10 miles north of Harbor Springs (the nearest incorporated city), and is in Emmet County. Readmond abuts Lake Michigan and is a popular tourist area in the summer when its population increases substantially. The year-round, permanent residents of Readmond totaled approximately 370 and 500 in 1990 and 2000, respectively.

The Readmond Township Park is a small park that is publicly owned by Readmond. It has in it a picnic table, a sandy beach with approximately 200 feet of frontage, and limited parking for

---

[5] Although M-119 is a closer public point, Mr. Glass does not allow people to cross his property to get to the shoreline from M-119. Mr. Glass would consider such people to be trespassers.

approximately 15 cars.  On both sides of the park are private homes which extend down to the water.  No incorporated cities are found to the north of Readmond.

The nearest public access to the shoreline to the north of the property is approximately 4 miles away in Cross Village. Cross Village is in Emmet County and is also the nearest public access for boats to enter Lake Michigan.  The public area in Cross Village includes 200 to 300 feet of lakefront property.

F.  Zoning Rules as to the Property

During 1992 and 1993, part of the property was zoned "scenic resource 2" (SR-2), and the rest of the property was zoned "recreation residential 2" (RR-2).  The SR-2 class applied to the 400 feet of the property that started at the M-119 road right of way.[6]  The zoning restrictions overlapped any other restriction placed on the property as to construction, building, or development.

1.  SR-2 Class

The SR-2 class is essentially a single-family, low-density, residential classification that allows any residential-related use.  The SR-2 class requires that a building lot have a minimum size of 30,000 square feet, with at least one side measuring at least 150 feet.  The portion of the property zoned SR-2 also

---

[6] The road is the traveled part and the road right of way is the easement in which the road exists.

included from the M-119 road right of way a 40-foot scenic greenbelt setback (which may be included within the 30,000-square-foot minimum lot size) in which tree removal, clearing, or construction was restricted. With the exception of these zoning rules, the Federal, State, and local governments generally allowed petitioners to do whatever they desired as to the portion of the property zoned SR-2. The portion of the property zoned SR-2 was large enough that it could probably be divided into four building lots of 30,000 square feet each.

### 2. RR-2 Class

The RR-2 class is designed to accommodate cottage and seasonal home development. The RR-2 class requires that each building lot have a minimum size of 22,000 square feet with at least one side measuring at least 100 feet. The portion of the property zoned RR-2 also included from the high water mark a 60-foot waterfront setback in which building or development was not allowed. The conservation easements included space that was within this 60-foot limitation.

### 3. Exceptions to the General Zoning Rules

The required minimum lot sizes under SR-2 and RR-2 could be smaller if the lots had central (e.g., from the municipality) sewer and water. In the case of RR-2, the required lot size would then be 12,000 square feet with at least one side measuring at least 100 feet. The portion of the property subject to the

60-foot limitation may be included in ascertaining the building site of 12,000 square feet, as may be the portions of the property covered by the conservation easements.

G.  Building on the Side of the Bluff

Some homes in Emmet County were built on the bluff along Lake Michigan.  The construction of a home on a bluff on or near the property interferes with the bluff's natural scenic beauty. It also interferes with and destroys the natural habitat of wildlife or plants that live or grow naturally on or near the bluff.  There also are risks of a landslide in building on or near a bluff.

H.  Enjoyment of the Property

The primary enjoyment of the Lake Michigan shoreline in Emmet County is derived in the summer, particularly during July and August.  During the summer months (especially July and August), people travel to that shoreline primarily to swim in Lake Michigan and to relax on the beach there.  With the exception of people staying on the shoreline in Emmet County, people generally do not travel to Emmet County to go boating.

A scenic view of the property is seen from watercraft on Lake Michigan and from the property's shoreline.  As to the former, the waters of Lake Michigan near the property at a distance of at least one-half mile to 1 mile into the water are some of the most heavily traveled parts of Lake Michigan.  With

the exception of recreational watercraft used by people staying on the shoreline on or near the property, recreational watercraft generally do not use those waters because a public harbor is not relatively close to the property. The recreational watercraft that do use those waters do so mainly in July and August and, with the exception of recreational watercraft used by people staying on the shoreline on or near the property, seldom come close to the shoreline of the property. In the winter, only freighters use the waters near the property, and they do so at a distance that is approximately 1 mile into the water.

Few people walk the Lake Michigan shoreline in Emmet County at times other than in the summer. In the summer (primarily July and August), many people walk that shoreline, and many people believe that the public is allowed to walk along any part of a Great Lake shoreline up to the ordinary high water mark.[7] Some people do not walk on private beaches on Lake Michigan because they view those beaches as the private property of another. The people who walk the shoreline on or near the property are

---

[7] In Glass v. Goeckel, 683 N.W.2d 719 (Mich. Ct. App. 2004), the court ruled contrary to this belief that people who own land on Lake Huron have the exclusive right to use and enjoy that land up to the water's edge. The trial court had ruled that the public had a right to walk on the portion of that land that was between the ordinary highwater mark and the water's edge. In reversing the trial court, the court of appeals held that the general public may pass that land only by walking in the water. The Supreme Court of Michigan agreed to hear an appeal of that case and is currently considering this issue.

generally neighboring landowners (or the renters of homes on that land), family, or friends. The landowners on Lake Michigan generally have an informal understanding that they (or their guests, including renters of their land) may walk along Lake Michigan on each other's land.

IV. Easement on the Property Contributed by Petitioners in 1990

On December 31, 1990, petitioners recorded a document (previous deed) entitled "Deed of Conservation Easement". The previous deed reflected an easement (previous easement) that petitioners contributed to the Lake Traverse Conservancy (LTC) Trust (trust). The previous easement covers the approximately 2.64 acres of the property consisting of the width of the property at M-119 and 250 feet inland towards Lake Michigan.[8] The previous deed generally restricts the building, construction, development, or removal of trees on the portion of the property encumbered by the previous easement (encumbered woodland), but allows for the building of (and removal of trees for) a 3,200-square-foot garage/work space/studio and related access road. When petitioners contributed the previous easement to the trust, petitioners did not consider whether or how the development of the unencumbered portion of the property would affect the encumbered woodland.

_____

[8] The previous deed notes that an access road runs through the previous easement to the garage, which is on a portion of the property not covered by the previous easement.

On their 1990 Federal income tax return (1990 return), petitioners claimed as a deduction a $94,000 noncash charitable contribution of the previous easement.  Petitioners attached to their 1990 return a letter from Robert W. Frame (Frame), C.A.E., M.A.I., stating that he had appraised the previous easement at a fair market value of $94,000.  Frame stated in the letter that he had estimated that the fair market value of the encumbered woodland was $114,000 before the previous easement was imposed, that the fair market value of the encumbered woodland was $10,000 after the previous easement was imposed, and that the previous easement enhanced by $10,000 the fair market value of the portion of the property that was not encumbered by the previous easement. Frame concluded in the letter that these numbers resulted in the claimed $94,000 fair market value for the previous easement ($114,000 - ($10,000 + $10,000) = $94,000).

V.   Easement on the Property Contributed by Petitioners in 1992

On December 28, 1992, petitioners signed a document (deed 1) entitled "Conservation Easement".  Deed 1 was recorded at the Register of Deeds for Emmet County on December 29, 1992.  LTC prepared deed 1 contemporaneously with petitioners' contribution to the trust of conservation easement 1 in perpetuity.  At the time of that contribution, petitioners also contributed $2,000 to the trust.

Conservation easement 1 covers the part of the property consisting of the northernmost 150 feet of shoreline and all portions landward for 120 feet from the ordinary high water mark (encumbered shoreline 1). Deed 1 states that encumbered shoreline 1 "contains a relatively intact forested ecosystem, providing wildlife habitat, as well as habitat for old growth white pine trees", that "lake front property in and around the area of the Property is under intense development pressure, thereby causing or at least exacerbating the impact on rare and protected flora and fauna of the area such as the piping plover * * * and Huron Tansy",[9] and that petitioners and LTC

> recognize the scenic and natural resource values of the Property and share the common intention to conserve these values in perpetuity by the conveyance of a Conservation Easement to protect the use or development of the Property for any purpose or in any manner which would conflict with the maintenance of these scenic and natural resource values.

Deed 1 states further that

> The purpose of this Conservation Easement is to ensure that the scenic and natural resource values of the Property will be retained forever. This Conservation Easement is intended to prevent the use or development of the Property for any purpose or in any manner which conflicts with the perpetual maintenance of these scenic and natural resource values. By executing this Conservation Easement, the Grantors acknowledge that they are giving up development rights associated with

---

[9] The reference in deed 1 to "wildlife", "flora and fauna", and the specific species of those items was a general reference to wildlife, flora and fauna, and the specific species found along the Lake Michigan shoreline in Emmet County and not necessarily on encumbered shoreline 1.

the Property. In addition, this Conservation Easement includes covenants on the part of the Grantors to refrain from doing certain acts, as set forth below, so that all uses of the Property will be consistent with this Conservation Easement. Grantee accepts this Conservation Easement to conserve the natural resources and scenic values of the Property for the present and future generations. The parties acknowledge that this Conservation Easement constitutes a servitude upon the land and runs with the land.

Deed 1 goes on to list activities that are restricted on encumbered shoreline 1 (e.g., mining activities and, except as otherwise provided in deed 1, development, construction, improvement, or similar acts that would destroy any part of encumbered shoreline 1), and activities that are permitted on encumbered shoreline 1 (e.g., alteration of trees to provide views of Lake Michigan, construction of foot paths to the Lake Michigan shoreline, and certain construction of overlook decks, patios, or boat houses). Deed 1 generally states that petitioners are liable for any cost incurred by LTC to enforce conservation easement 1 and allows conservation easement 1 to be terminated "If subsequent, unexpected changes in the Property, or nearby property, render the Purpose of this Conservation Easement impossible to achieve". Deed 1 states that LTC

> may transfer or otherwise assign this Conservation Easement only to a qualified conservation organization which agrees to enforce this Conservation Easement in accordance with the regulations established by the Internal Revenue Service governing such transfers and the laws of the State of Michigan. If Grantee ceases to exist, Grantee's rights and obligations under this Conservation Easement shall immediately vest in the following entities in the following order to the extent

they evince an intent to accept this Conservation
Easement:  (a) The Nature Conservancy, (b) the Michigan
department of Natural Resources, or (c) any other
appropriate organization which qualifies under Section
170(h)(3) of the Code, has conservation purposes, and
is qualified to accept and hold this Conservation
Easement either voluntarily or through an award of such
right by a court of competent jurisdiction under the
doctrine of cy pres.

Deed 1 does not restrict petitioners' right to develop any part of the property not covered by conservation easement 1.

Petitioners obtained from Frame an appraisal of conservation easement 1 and attached to their 1992 return a letter from Frame stating that he had appraised conservation easement 1 at a fair market value of $99,000.  Frame stated in the letter that he had estimated that the fair market value of encumbered shoreline 1 was $249,000 before conservation easement 1 was imposed, that the fair market value of encumbered shoreline 1 was $99,500 after conservation easement 1 was imposed, and that conservation easement 1 enhanced by $50,500 the fair market value of the portion of the property not covered by conservation easement 1. Frame concluded in the letter that these numbers resulted in the claimed $99,000 fair market value for conservation easement 1 ($249,000 - ($99,500 + $50,500) = $99,000).

Petitioners claimed on their 1992 return that they had made total charitable contributions of $108,957, consisting of a $99,000 noncash contribution of conservation easement 1 and cash contributions of $9,957.  Petitioners deducted on their 1992

return $95,569 of the total claimed charitable contributions and carried over the $13,388 balance to 1993.

VI.  Easement on the Property Contributed by Petitioners in 1993

On December 28, 1993, petitioners signed a document (deed 2) entitled "Lakefront Conservation Easement #2".  Deed 2 was recorded in the Emmet County Register of Deeds on December 30, 1993, and re-recorded there on November 24, 1994.  LTC prepared deed 2 contemporaneously with petitioners' contribution to the trust of conservation easement 2 in perpetuity.  At the time of that contribution, petitioners also contributed $2,000 to the trust.  On December 30, 1993, a mortgagee of the property agreed to subordinate its mortgage on the property to the extent necessary to permit LTC to enforce the purpose of conservation easement 2 in perpetuity.

Conservation easement 2 covers the part of the property consisting of the southernmost 260 feet of shoreline and all portions landward for 120 feet from the ordinary high water mark (encumbered shoreline 2).  Deed 2 states verbatim with deed 1 that encumbered shoreline 2 "contains a relatively intact forested ecosystem, providing wildlife habitat, as well as habitat for old growth white pine trees", that "the lake front property in and around the area of the Property is under intense development pressure, thereby causing or at least exacerbating the impact on rare and protected flora and fauna of the area such

as the piping plover * * * and Huron Tansy",[10] and that

petitioners and LTC

> recognize the scenic and natural resource values of the Property and share the common intention to conserve these values in perpetuity by the conveyance of a Conservation Easement to protect the use or development of the Property for any purpose or in any manner which would conflict with the maintenance of these scenic and natural resource values.

Deed 2 also states verbatim with deed 1 that

> The purpose of this Conservation Easement is to ensure that the scenic and natural resource values of the Property will be retained forever. This Conservation Easement is intended to prevent the use or development of the Property for any purpose or in any manner which conflicts with the perpetual maintenance of these scenic and natural resource values. By executing this Conservation Easement, the Grantors acknowledge that they are giving up development rights associated with the Property. In addition, this Conservation Easement includes covenants on the part of the Grantors to refrain from doing certain acts, as set forth below, so that all uses of the Property will be consistent with this Conservation Easement. Grantee accepts this Conservation Easement to conserve the natural resources and scenic values of the Property for the present and future generations. The parties acknowledge that this Conservation Easement constitutes a servitude upon the land and runs with the land.

Deed 2 goes on to list activities that are restricted on encumbered shoreline 2 (e.g., mining activities and, except as otherwise provided in deed 2, development, construction, improvement, or similar acts that would destroy any part of

---

[10] The reference in deed 2 to "wildlife", "flora and fauna", and the specific species of those items was a general reference to wildlife, flora and fauna, and the specific species found along the Lake Michigan shoreline in Emmet County and not necessarily on encumbered shoreline 2.

encumbered shoreline 2), and activities that are permitted on encumbered shoreline 2 (e.g., alteration of trees to provide views of Lake Michigan, construction of foot paths to the Lake Michigan shoreline, and certain construction of overlook decks, patios, or boat houses). Deed 2 generally states that petitioners are liable for any cost incurred by LTC to enforce conservation easement 2 and allows conservation easement 2 to be terminated "If subsequent, unexpected changes in the Property, or nearby property, render the Purpose of this Conservation Easement impossible to achieve". Deed 2 states that LTC

> may transfer or otherwise assign this Conservation Easement only to a qualified conservation organization which agrees to enforce this Conservation Easement in accordance with the regulations established by the Internal Revenue Service governing such transfers and the laws of the State of Michigan. If Grantee ceases to exist, Grantee's rights and obligations under this Conservation Easement shall immediately vest in the following entities in the following order to the extent they evince an intent to accept this Conservation Easement: (a) The Nature Conservancy, (b) the Michigan department of Natural Resources, or (c) any other appropriate organization which qualifies under Section 170(h)(3) of the Code, has conservation purposes, and is qualified to accept and hold this Conservation Easement either voluntarily or through an award of such right by a court of competent jurisdiction under the doctrine of cy pres.

Deed 2 does not restrict petitioners' right to develop any part of the property not covered by conservation easement 2.

Petitioners obtained from Frame an appraisal of conservation easement 2 and attached to their 1993 return a letter from Frame stating that he had appraised conservation easement 2 at a fair

market value of $241,800. Frame stated in the letter that he had estimated that the fair market value of encumbered shoreline 2 was $483,600 before conservation easement 2 was imposed, that the fair market value of encumbered shoreline 2 was $193,400 after conservation easement 2 was imposed, and that conservation easement 2 enhanced by $48,400 the fair market value of the portion of the property that was not covered by conservation easement 2. Frame concluded in the letter that these numbers resulted in the claimed $241,800 fair market value for conservation easement 2 ($483,600 - ($193,400 + $48,400) = $241,800).

Petitioners claimed on their 1993 return that they had made total charitable contributions of $266,602, consisting of a $241,800 noncash contribution of conservation easement 2, cash contributions of $11,414, and the $13,388 carryover from 1992. Petitioners deducted on their 1993 return $128,473 of the total claimed contributions and carried over the $138,129 balance to 1994. Petitioners later deducted $86,939 of the carryover for 1994 and the remainder for 1995.

VII. The Conservation Easements

Development of the lakefront immediately to the north and south of the property is not limited by any restrictive easement similar to the conservation easements. When petitioners contributed the conservation easements to the trust, petitioners

and LTC understood that restrictions were not placed on petitioners' use of the unencumbered portions of the property. Petitioners also understood at those times that they (or a subsequent owner of the property) could develop the unencumbered portions of the property in any desired way (subject to zoning limitations). Petitioners did not consider at those times whether or how development of the unencumbered portions of the property would affect the ecosystem of the portions of the property covered by the conservation easements. Petitioners did not grant any restrictive easement on the middle of the property because they wanted to be able to develop it if they desired.

LTC wanted to obtain the conservation easements, and sought and continues to seek to obtain similar conservation easements in northern Michigan, because LTC believes that northern Michigan is relatively undeveloped as compared with other parts of the State. Significant and abundant natural resources are present in northern Michigan, particularly around M-119 and the nearby shoreline, and LTC believes that these resources may be threatened by overdevelopment. LTC attempts to balance a development of northern Michigan with a development of new nature preserves and the protection of areas for wildlife and scenic views.

LTC made a special effort in the 1990s to attempt to conserve land in the area of the property. Bald eagles were

returning to that area, and LTC believed that bald eagles are very sensitive to human activity. Much development also had occurred near the property, including the subdividing of land in a manner that LTC believed threatened to hurt the scenic quality and drive out the wildlife. LTC wanted to minimize any development of the shoreline on or near the property so as not to drive out the bald eagles, to protect the natural scenic beauty of the bluff, and to protect the habitat for local wildlife and plants including Lake Huron tansy and pitcher's thistle.

LTC acknowledged and accepted the conservation easements on the basis of the legal descriptions set forth in deed 1 and deed 2. LTC accepted the conservation easements in part to protect the Lake Michigan shoreline of the property going up to and over the top of the bluff so as to preserve intact the present or potential habitat there for wildlife and plants. LTC also accepted the conservation easements in part to protect the structure of the bluff itself; e.g., by controlling any erosion of that bluff. The bluff is sandy, delicate, and subject to erosion. Building on the bluff would erode the bluff and displace the vegetation growing on it.

The conservation easements have not restricted petitioners' use or enjoyment of the property but have limited the development of encumbered shoreline 1 and encumbered shoreline 2 (collectively, encumbered shoreline). Petitioners contributed

the conservation easements to the trust to protect the encumbered shoreline from development and to deduct a resulting charitable contribution.  As to the former, petitioners hoped that their neighbors would also restrict a similar portion of their real estate in order to conserve it.

The conservation easements preclude petitioners from building on the lakefront lots of the property and, as granted, cover some but not all of the bluff on the property; neither of the conservation easements reaches the top of the bluff, and the conservation easements cover only 410 of the 460 feet of the shoreline of the property.[11]  When they granted the conservation easements, petitioners believed that the conservation easements extended over the top of the bluff.  They learned they were mistaken when the property was later surveyed (the property was not surveyed when they bought it).  In July 2004, petitioners filed a lawsuit (lawsuit) in Emmet County Circuit Court against LTC.  The lawsuit, which is currently pending, seeks a reformation of the deeds underlying the conservation easements to enlarge the encumbered shoreline.

---

[11] When they contributed conservation easement 2 to the trust, petitioners knew that 50 feet of shoreline was unencumbered.  Petitioners may develop that unencumbered shoreline in any way consistent with the zoning requirements.

VIII.  LTC

LTC is a Michigan nonprofit organization described in section 170(c) and exempt from Federal income tax under section 501(c)(3).  LTC has more than 4,200 members and is the largest membership-supported nonprofit organization in northern Michigan. LTC's current endowment fund is $4 million.  LTC's endowment fund from 1992 through 1995 was between $1.25 and $2.5 million.

LTC has operated for more than three decades to preserve land and wilderness in trust for conservation and for the recreation and education of the people of Michigan.  LTC's purpose is to protect the natural integrity and scenic beauty of northern Michigan for the enjoyment of future generations.[12]  LTC supports its purpose by:  (1) Acquiring property by contribution or purchase, (2) obtaining easements such as the conservation easements by gift or through purchase, and (3) educating the public about the purposes of LTC.  LTC currently owns approximately 75 miles of shoreline on rivers, lakes, and streams in northern Michigan.

When a landowner contributes an easement to LTC, LTC typically also asks for and receives a cash contribution from that landowner.  The cash contribution is meant to help LTC monitor and, if necessary, enforce the terms of the easement.

---

[12] In this context, the "natural integrity" of the land includes its ecosystem concept which refers to the protection of the ecosystem of wildlife, fish, plants, and animals.

LTC also helps the landowner find an appraiser to value the contributed property by furnishing the landowner with a list of appraisers, all of whom attended a seminar on the subject sponsored by LTC.  LTC also usually gives the landowner some brochures explaining the mechanics of a conservation easement and a guide detailing the tax ramifications of a conservation easement and the contribution thereof.  LTC does not value any easement that it receives from a landowner, and LTC does not acknowledge or accept any valuation of the easement.  LTC usually verifies its receipt of a contributed easement by signing Form 8283, Noncash Charitable Contributions.

LTC does not on an annual basis formally monitor each conservation easement that it receives to ensure compliance but occasionally monitors them informally.  LTC maintains a file for each of these easements.

## OPINION

We decide whether petitioners' contributions of the conservation easements are qualified conservation contributions under section 170(h)(1).  Petitioners argue they are.[13] According to petitioners, the conservation easements prohibit any construction, development, or disturbance of the natural state of

---

[13] While petitioners filed the lawsuit to reform the deeds underlying the conservation easements, we decide this case on the basis of the specific property that petitioners actually contributed to the trust in 1992 and 1993.

the bluff on the encumbered shoreline.  Petitioners conclude that the conservation easements:  (1) Protect a relatively natural habitat for wildlife and plants, (2) preserve open space for the scenic enjoyment of the general public, which will yield a significant public benefit, and (3) preserve open space pursuant to clearly delineated public policies set forth in the Emmet County zoning ordinances and in the Endangered Species Act of 1973, Pub. L. 93-205, sec. 2(b), 87 Stat. 884, current version at 16 U.S.C. sec. 1531(b) (2000), which will yield a significant public benefit.  Respondent argues that petitioners have not proven that the conservation easements did any of those things.  Respondent concludes, argues, and determined that the conservation easements are not qualified conservation contributions under section 170(h)(1).

Respondent's deficiency determination is presumed correct, and petitioners must prove it wrong in order to prevail.[14] Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners must prove their entitlement to deduct their claimed

_____

[14] In certain cases, if an individual introduces credible evidence with respect to a factual issue relevant to ascertaining his or her proper tax liability, sec. 7491 places the burden of proof on the Commissioner as to that issue.  See sec. 7491(a); Rule 142(a)(2).  Sec. 7491 applies to court cases arising in connection with examinations commencing after July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(2), 112 Stat. 726.  Because the examination underlying this case commenced before July 23, 1998, sec. 7491(a) does not apply to shift the burden of proof to respondent.

charitable contributions; deductions are strictly a matter of legislative grace, and petitioners must satisfy the specific statutory requirements for their claimed deductions. Deputy v. DuPont, 308 U.S. 488, 493 (1940).

Section 170(a)(1) generally allows a deduction for any charitable contribution made during the taxable year. In this context, a charitable contribution includes a gift of property to a charitable organization, made with charitable intent and without the receipt or expectation of receipt of adequate consideration. See Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986); see also sec. 1.170A-1(h)(1) and (2), Income Tax Regs. While section 170(f)(3) generally does not allow an individual to deduct a charitable contribution for a gift of property consisting of less than his or her entire interest in that property, an exception applies in the case of a "qualified conservation contribution." See sec. 170(f)(3)(B)(iii). A contribution of real property is a qualified conservation contribution if (1) the real property is a "qualified real property interest", (2) the contributee is a "qualified organization", and (3) the contribution is "exclusively for conservation purposes" (collectively, three requirements). Sec. 170(h)(1); see also sec. 1.170A-14(a), Income Tax Regs.

As to the first of the three requirements, an interest in real property is a qualified real property interest if the interest is the donor's entire interest in that real property (other than a qualified mineral interest), a remainder interest, or a restriction granted in perpetuity on the use which may be made of the real property. Sec. 170(h)(2). In the case of the latter, i.e., a restriction granted in perpetuity on the use which may be made of the real property, the regulations interpreting that provision clarify that such a restriction must be legally enforceable to limit any use of the real property that is inconsistent with the conservation purpose of the contribution. See sec. 1.170A-14(g)(1), Income Tax Regs. These regulations note that this requirement may be met by recording the restriction in the land records of the jurisdiction in which the real property is located. Id.

As to the second of the three requirements, a contributee is a qualified organization if it is described in section 170(h)(3). The regulations interpreting this provision mandate that the organization be committed to protecting the conservation purposes of the contribution and have the resources necessary to enforce the restrictions granted in perpetuity. Sec. 1.170A-14(c)(1), Income Tax Regs.

As to the third of the three requirements, a contribution is made exclusively for conservation purposes if it meets the tests

of section 170(h)(4) and (5). Section 170(h)(4)(A) generally provides that a contribution is for a conservation purpose if it: (1) Preserves land for outdoor recreation by, or the education of, the general public, (2) protects a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem, (3) preserves open space for the scenic enjoyment of the general public or pursuant to a Federal, State, or local governmental conservation policy, and this preservation will yield a significant public benefit, or (4) preserves a historically important land area or a certified historic structure. See also sec. 1.170A-14(d)(1), Income Tax Regs. Under the statute, each of these four prongs is a conservation purpose in and of itself, and a taxpayer's satisfaction of one of these prongs suffices to establish the requisite conservation purpose. See also S. Rept. 96-1007, at 10 (1980), 1980-2 C.B. 599, 604. Section 170(h)(5)(A) generally provides that a contribution of a qualified real property interest may be exclusively for conservation purposes only if it is protected in perpetuity. The statute contains no further specific guidance as to when a contribution of a qualified real property interest that is protected in perpetuity will be exclusively for conservation purposes.

The requirement in section 170(h)(1)(C) that a qualified contribution of a conservation easement be "exclusively for charitable purposes" may be traced to the Tax Reform Act of 1969

(TRA 1969), Pub. L. 91-172, sec. 201(a), 83 Stat. 549. Congress generally provided in section 170(f)(3)(A), as then enacted, that an individual may not deduct a charitable contribution for contributed property in which he or she retained an interest. See TRA 1969 sec. 201(a)(1). However, Congress provided in section 170(f)(3)(B)(ii), as then enacted, that this general rule of nondeductibility would not apply if the contribution was of an undivided portion of the taxpayer's entire interest in the property. See TRA 1969 sec. 201(a). The conferees stated in their report on section 170(f)(3)(B)(ii) that they intended that such an undivided interest include an open space easement in gross where the easement was in perpetuity.[15] H. Conf. Rept. 91-782, at 294 (1969), 1969-3 C.B. 644, 654. In light of this statement, the regulations interpreting section 170(f)(3)(B)(ii), as enacted in 1969, allowed a charitable deduction for the fair market value of an easement contributed to a charitable organization in perpetuity where the easement restricts the use of the taxpayer's property; e.g., by limiting the type and height of buildings that may be erected, the removal of trees, the

---

[15] Sec. 1.170A-7(b)(1)(ii), Income Tax Regs., defines an "easement in gross" as "a mere personal interest in, or right to use, the land of another; it is not supported by a dominant estate but is attached to, and vested in, the person to whom it is granted." See also Black's Law Dictionary 527 (7th ed. 1999) (the term "easement in gross" denotes "An easement benefitting a particular person and not a particular piece of land").

erection of utility lines, the dumping of trash, and the use of signs.  See sec. 1.170A-7(b)(1)(ii), Income Tax Regs.

In the Tax Reduction and Simplification Act of 1977 (TRSA), Pub. L. 95-30, sec. 309(a), 91 Stat. 154, Congress enacted the initial version of section 170(f)(3)(B)(iii), creating an exception from the general rule of section 170(f)(3)(A) for an "easement with respect to real property granted in perpetuity to an organization described in subsection (b)(1)(A) exclusively for conservation purposes".[16]  The conference report on TRSA explained that

> While it is intended that the term "conservation purposes" be liberally construed with regard to the types of property with respect to which deductible conservation easements * * * may be granted, it is also intended that contributions of perpetual easements * * * qualify for the deduction only in situations where the conservation purposes of protecting or preserving the property will in practice be carried out.  Thus, it is intended that a contribution of a conservation easement * * * qualify for a deduction only if the holding of the easement * * * is related to the purpose

_____

[16] Congress coined the terms "conservation purposes" and "exclusively for conservation purposes" in the Tax Reform Act of 1976 (TRA 1976), Pub. L. 94-455, sec. 2124(e)(1)(C) and (D), 90 Stat. 1919.  Congress provided further in the TRA 1976 that the term "conservation purposes" in this context means (1) "the preservation of land areas for public outdoor recreation or education, or scenic enjoyment", (2) "the preservation of historically important land areas or structures", or (3) "the protection of natural environmental systems".  TRA 1976 sec. 2124(e)(1)(D); see also sec. 170(f)(3)(C), as enacted by TRA 1976.  Congress did not in the TRA 1976 define (or indicate the meaning of) either the word "exclusively" or the term "exclusively for conservation purposes".  Nor does the legislative history of the TRA 1976 shed any light on the meaning of that word or that term.

or function constituting the donee's purpose for exemption (organizations such as nature conservancies, environmental, and historic trusts, State and local governments, etc.) and the donee is able to enforce its rights as holder of the easement * * * and protect the conservation purposes which the contribution is intended to advance. The requirement that the contribution be exclusively for conservation purposes is also intended to limit deductible contributions to those transfers which require that the donee hold the easement * * * exclusively for conservation purposes (i.e., that they not be transferable by the donee in exchange for money, other property, or services). [H. Conf. Rept. 95-263, at 30-31 (1977), 1977-1 C.B. 519, 523.]

As originally enacted, the provisions of former section 170(f)(3)(B)(iii) did not apply to contributions made after June 13, 1981. TRSA sec. 309(b)(1), 91 Stat. 154. In the Tax Treatment Extension Act of 1980 (TTEA), Pub. L. 96-541, sec. 6(a), 94 Stat. 3206, Congress effectively extended those provisions permanently. The Senate report behind this extension noted the committee's belief that the preservation of our country's natural resources and cultural heritage was important and that conservation easements play an important role in this preservation. S. Rept. 96-1007, supra at 9, 1980-2 C.B. at 603. The report also noted that

The committee also recognizes that it is not in the country's best interest to restrict or prohibit the development of all land areas and existing structures. Therefore, the committee believes that provisions allowing deductions for conservation easements should be directed at the preservation of unique or otherwise significant land areas or structures. Accordingly, the committee has agreed to extend the expiring provisions of present law on a permanent basis and modify those provisions in several respects.

In particular, the committee found it appropriate to expand the types of transfers which will qualify as deductible contributions in certain cases where the contributions are likely to further significant conservation goals without presenting significant potential for abuse. In addition, the committee bill would restrict the qualifying contributions where there is no assurance that the public benefit, if any, furthered by the contribution would be substantial enough to justify the allowance of a deduction. In addition, the committee decided that the treatment of open space easements should be clarified. [Id. at 9-10, 1980-2 C.B. at 603.]

With our understanding of the statute and its relevant legislative history in mind, we now turn back to the three requirements for a qualified conservation contribution. Respondent concedes that the first and second requirements have been met; i.e., the conservation easements are qualified real property interests and the contributee is a qualified organization under section 170(h)(3). As to the third requirement, respondent challenges petitioners' assertion that the conservation easements protect a relatively natural habitat of wildlife or plants for purposes of section 170(h)(4)(A)(ii). Respondent also challenges petitioners' assertion that the conservation easements preserve open space in the manner required by section 170(h)(4)(A)(iii). Petitioners will prevail as to this issue if (1) they establish either of those conservation purposes as to the contributions and (2) they meet the requirement in section 170(h)(5) that the contributions be exclusively for at least one of those conservation purposes.

As to the first assertion, section 1.170A-14(d)(3)(i), Income Tax Regs., interprets section 170(h)(4)(A)(ii) to provide that a qualified real property interest will meet the conservation purposes test, and thus satisfy the third requirement before us, if that interest is contributed "to protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem, normally lives".  For this purpose, section 1.170A-14(d)(3)(ii), Income Tax Regs., lists as examples of significant habitats and ecosystems:  (1) Habitats for rare, endangered, or threatened species of animals, fish, or plants, (2) natural areas that represent high quality examples of a terrestrial or aquatic community, such as islands that are undeveloped or not intensely developed where the coastal ecosystem is relatively intact, and (3) natural areas which are included in, or which contribute to, the ecological viability of a local, State, or National park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.  Section 1.170A-14(d)(3)(iii), Income Tax Regs., explains that a contribution of a qualified real property interest that meets this significant habitat or ecosystem test is deductible even if, as here, the public's right to access that property is restricted.  The legislative history of the TTEA states that a contribution is "considered to be made for conservation purposes if it will operate to protect or

enhance the viability of an area or environment in which a fish, wildlife, or plant community normally lives or occurs." S. Rept. 96-1007, supra at 10, 1980-2 C.B. at 604. That legislative history emphasizes that "The committee intends that contributions for this purpose will protect and preserve significant natural habitats and ecosystems". Id. at 11, 1980-2 C.B. at 604.

Respondent argues that petitioners have not satisfied any of the examples set forth in the regulations. We disagree. LTC's executive director, Thomas Bailey (Bailey), testified credibly that the property is a "famous" roosting spot for bald eagles and that the conservation easements establish a proper place for the growth and existence of Lake Huron tansy and pitcher's thistle. Bailey also testified credibly that he has toured the property on various occasions, that the habitat on the encumbered shoreline is a proper and normal environment for Lake Huron tansy, pitcher's thistle, and bald eagles, among other species, and that the staff of LTC has seen Lake Huron tansy growing on the property. Ms. Glass testified credibly that she also has seen Lake Huron tansy growing on the property and that she has regularly seen bald eagles there as well. She also testified credibly that at least one of those eagles roosts on a tree growing on encumbered shoreline 1. We also find in the record probative evidence that both Lake Huron tansy and pitcher's thistle are considered threatened species which are worthy of

special attention towards the goal of preservation and that LTC, the largest membership-supported nonprofit organization in northern Michigan, has agreed through the conservation easements to attempt to preserve those species by giving them that special attention.

We apply the plain meaning of the words "habitat" and "community" to interpret them for purposes of the statute and the regulations.  Cf. Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), affd. without published opinion 198 F.3d 248 (6th Cir. 1999); Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 299 (1996).  A habitat denotes "The area or environment where an organism or ecological community normally lives or occurs" or "The place where a person or thing is most likely to be found."  American Heritage Dictionary of the English Language 786 (4th ed. 2000); see also 7 C.F.R. sec. 636.3 (2002) ("Wildlife habitat means the aquatic and terrestrial environments required for wildlife to complete their life cycles, including air, food, cover, water, and spatial requirements.").  A community may be defined in this context as "A group of plants and animals living and interacting with one another in a specific region under relatively similar environmental conditions." American Heritage Dictionary of the English Language 374.

The encumbered shoreline fits those definitions of "habitat" and "community".  In its natural undeveloped state, it is a

"relatively natural habitat" for a community of Lake Huron tansy, of pitcher's thistle, and of bald eagles, among other species of plants and wildlife.  Each of the conservation easements will therefore protect and preserve significant natural habitats by limiting the development or use of the encumbered shoreline.[17] By the same token, petitioners' contributions of the conservation easements operate to protect or enhance the viability of an area or environment in which a wildlife community and a plant community normally live or occur.  Both portions of encumbered shoreline also have natural values that make them possible places to create or promote the habitat of Lake Huron tansy as well as the habitat of bald eagles.  We hold that petitioners have proven that their contributions of the conservation easements were for a conservation purpose under section 170(h)(4), specifically, section 170(h)(4)(A)(ii).[18]

We turn to the question of whether petitioners' contributions also meet the "exclusively for conservation purposes" requirement of section 170(h)(5).  We read that term to place a focus on the contributee's holding of a qualified real

---

[17] We read sec. 170(h)(4)(A)(ii) to mean that the protection of a relatively natural habitat of wildlife or plants, in and of itself, is a significant conservation purpose within the intent of the statute.

[18] On the basis of this holding, we need not and do not consider petitioners' other arguments that the conservation easements also meet the requirements of sec. 170(h)(4)(A)(iii).

property interest and, more specifically, to require that the contributee hold such an interest in perpetuity exclusively for one or more of the conservation purposes listed in section 170(h)(4). While the term was included in the TRA 1976 without any specific indication as to its meaning, see discussion supra note 16, the legislative history of the TRSA briefly discusses the meaning of that term. Although the view of a subsequent Congress is not a controlling basis from which to infer the intent of an earlier Congress, Haynes v. United States, 390 U.S. 85, 87 n.4 (1968); United States v. Philadelphia Natl. Bank, 374 U.S. 321, 348-349 (1963), we note that the TRSA modified former section 170(f)(3)(B) by adding a provision (former section 170(h)(3)(B)(iii)) containing the phrase "exclusively for conservation purposes" and that the legislative history to this modification is consistent with our reading. The legislative history states:

> it is intended that a contribution of a conservation
> easement * * * qualify for a deduction only if the
> holding of the easement * * * is related to the purpose
> or function constituting the donee's purpose for
> exemption * * * and the donee is able to enforce its
> rights as holder of the easement * * * and protect the
> conservation purposes which the contribution is
> intended to advance. The requirement that the
> contribution be exclusively for conservation purposes
> is also intended to limit deductible contributions to
> those transfers which require that the donee hold the
> easement * * * exclusively for conservation purposes
> (i.e., that they not be transferable by the donee in
> exchange for money, other property, or services). [H.
> Conf. Rept. 95-263, supra at 30-31, 1977-1 C.B. at
> 523.]

We conclude that petitioners' contributions meet the "exclusively for conservation purposes" requirement of section 170(h)(5). The contributee, LTC, is a legitimate, longstanding nature conservancy dealing at arm's length with petitioners, and LTC has agreed (and has the commitment and financial resources) to enforce the preservation-related restrictions included in deed 1 and deed 2 in perpetuity. LTC's holding of the conservation easements also is directly related to its tax-exempt purposes. We also note that petitioners through the restrictions in deed 1 and deed 2 have gratuitously surrendered valuable property rights in the encumbered shoreline, that those restrictions are legally enforceable to limit in perpetuity any inconsistent use of the encumbered shoreline, and that any subsequent holder of the conservation easements must be an entity fully committed to carrying out the contributions' charitable purposes. Congress through the enactment of section 170(h) intended in relevant part to encourage preservation of our country's natural resources through the contribution of easements such as the conservation easements, see S. Rept. 96-1007, supra at 9, 1980-2 C.B. at 603, and petitioners' contributions of the conservation easements, which serve to preserve this Nation's natural resources of bald eagles, Lake Huron tansy, and the bluff, among other things, are consistent with the statute's objective.

We hold that petitioners' respective contributions in 1992 and 1993 of the conservation easements are qualified conservation contributions under section 170(h)(1) because, in relevant part, they protect a relatively natural habitat of wildlife and plants and are exclusively for conservation purposes.[19]  In so holding, we have considered all arguments made as to the issues decided herein, and we have rejected as meritless those arguments not discussed herein.[20]

_____

[19] The encumbered shoreline is a portion of real property used by petitioners as their personal residence, and sec. 170(h)(4)(A)(ii) does not require that the protection of the natural habitats referenced therein be pursuant to a clearly delineated governmental conservation policy.  The staff of the Joint Committee on Taxation has recently prepared a report stating that sec. 170(h) is "so broad that the IRS effectively has no basis to challenge contributions claimed to have been made for such [conservation] purposes" and "the status quo in essence permits the donor and the donee, the two parties with the greatest incentive to reach such a conclusion, to determine that a conservation purpose is served."  Staff of the Joint Committee on Taxation, Options to Improve Tax Compliance and Reform Tax Expenditure 286 (Jan. 27, 2005).  The report proposes changes to sec. 170(h).  Id. at 1, 277.  The proposal, if adopted, would provide that the protection of the natural habitats referenced in sec. 170(h)(4)(A)(ii) is exclusively for conservation purposes only if it is pursuant to a clearly delineated governmental policy; i.e., it furthers a specific, identified conservation project.  Id. at 282.  The proposal, if adopted, would provide that a qualified real property interest is not considered as contributed exclusively for a conservation purpose if the donor (or a family member of the donor) has a right to use all or a portion of the real property as a personal residence at any time after the contribution.  Id. at 283.

[20] At trial, the Court severed from the matter at hand the issue concerning the fair market value of petitioners' contributions.  Respondent asserts as to the matter at hand that petitioners contributed a small portion of the property and

(continued...)

Accordingly,

An appropriate order

will be issued.

---

[20](...continued)
retained the right to build on the property's unencumbered
portions.  We view this assertion as relating not to the
characterization of the conservation easements as qualified
conservation contributions but as most directly related to a
determination of those contributions' fair market value.

APPENDIX

SEC. 170(h).  Qualified Conservation Contribution.--

(1) In general.--* * * the term "qualified conservation contribution" means a contribution--

(A) of a qualified real property interest,

(B) to a qualified organization,

(C) exclusively for conservation purposes.

(2) Qualified real property interest.--For purposes of this subsection, the term "qualified real property interest" means any of the following interests in real property:

(A) the entire interest of the donor other than a qualified mineral interest,

(B) a remainder interest, and

(C) a restriction (granted in perpetuity) on the use which may be made of the real property.

*    *    *    *    *    *    *

(4) Conservation purpose defined.--

(A) In general.--For purposes of this subsection, the term "conservation purpose" means--

(i) the preservation of land areas for outdoor recreation by, or the education of, the general public,

(ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,

(iii) the preservation of open space (including farmland and forest land) where such preservation is --

(I) for the scenic enjoyment of the general public, or

(II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy,

and will yield a significant public benefit, or

(iv) the preservation of an historically important land area or a certified historic structure.

(B) Certified historic structure.--For purposes of subparagraph (A)(iv), the term "certified historic structure" means any building, structure, or land area which --

(i) is listed in the National Register, or

(ii) is located in a registered historic district (as defined in section 47(c)(3)(B)) and is certified by the Secretary of the Interior to the Secretary as being of historic significance to the district.

A building, structure, or land area satisfies the preceding sentence if it satisfies such sentence either at the time of the transfer or on the due date (including extensions) for filing the transferor's return under this chapter for the taxable year in which the transfer is made.

(5) Exclusively for conservation purposes.--For purposes of this subsection--

(A) Conservation purpose must be protected.--A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity.