126 T.C. No. 16


UNITED STATES TAX COURT


JAMES D. AND BEVERLY H. TURNER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5165-04.                    Filed May 16, 2006.

        P, a real estate investor, purchased 29.3 acres of
unimproved land in a historical overlay district, 15.04
acres of which were located within a designated
floodplain.  Property development was subject to county
regulations that were more stringent for property
within a historical overlay district.  Among the
regulations were zoning and rezoning requirements, as
well as limitations on development of designated
floodplain areas.  Thirty lots were permissible under
current zoning.  County approval would be required for
denser zoning usage.  P, claiming that he was entitled
to develop up to 62 residences on smaller lots,
executed a deed to Fairfax County purporting to limit
development of the property to 30 residences.  On their
1999 Federal income tax return, Ps claimed a
contribution deduction for a qualified conservation
easement under sec. 170(h)(1), I.R.C.

1. <u>Held</u>: P did not make a contribution of a qualified conservation easement under sec. 170(h)(1), I.R.C., because the attempted grant did not satisfy the conservation purposes required under sec. 170(h)(4)(A), I.R.C. Specifically, the deed did not preserve open space or a historically important land area or certified historical structure.

2. <u>Held</u>, <u>further</u>, Ps are liable for a 20-percent penalty for negligence under sec. 6662, I.R.C.

<u>J. Carlton Howard, Jr.</u>, for petitioners.

<u>John M. Altman</u> and <u>Linda R. Averbeck</u>, for respondent.

GERBER, <u>Chief Judge</u>: Respondent determined a $178,168 income tax deficiency and a $56,537 accuracy-related penalty under section 6662[1] for petitioners' 1999 taxable year. After concessions,[2] the issues remaining for our consideration are:

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties settled the portion of respondent's income adjustments or penalties relating to the determination of an increase in the net gain from FAC Co., L.C., and a decrease in a home mortgage interest deduction. The parties agree that the $62,045 home mortgage interest deduction that petitioners claimed, and which respondent determined was $38,670, should be $56,872. The parties also agree that the portion of a $892,578 gain that petitioners reported on their return from FAC Co., L.C., an entity in which petitioners have a 60-percent interest, and which respondent determined was $1,215,027, should be $1,081,578. Finally, respondent concedes the portion of the penalties attributable to the home mortgage interest deduction and the net gain from FAC Co., L.C.

(1) Whether petitioners made a contribution of a qualified conservation easement under section 170(h)(1); (2) if qualified, we must decide the value of the easement; and (3) in the absence of a qualified contribution or, alternatively if the easement's value was substantially overstated, whether petitioners are liable for the accuracy-related penalty under section 6662.

## FINDINGS OF FACT[3]

### General Background

At the time their petition was filed, petitioners resided in Alexandria, Virginia. Petitioner[4] is an attorney whose practice is concentrated on real estate transactions in the vicinity of Alexandria, Virginia. Part of petitioner's business activity was the conduct of real estate closings through a title insurance company he owned. Petitioner was also an investor in real property. At all relevant times, he was a 60-percent member and general manager of FAC Co., L.C. (FAC), a limited liability company formed for the purpose of acquiring, rezoning, and developing real property. During 1997 and 1998, petitioner, individually or through FAC, embarked on a plan to acquire several contiguous parcels of land located in Woodlawn Heights,

---

[3]The parties' stipulation of fact is incorporated herein by this reference.

[4]Petitioners are husband and wife and they filed a joint return for the year in issue. References to petitioner alone are to petitioner James D. Turner.

Fairfax County, Virginia. The unimproved realty was situated in a historical district in the general area of Mount Vernon, the home of President George Washington, and adjacent to President Washington's Grist Mill (Grist Mill).

Acquisition of the Land for Development

Through several transactions, a 29.3-acre parcel was conglomerated by petitioner and/or FAC. One transaction involved the Future Farmers of America (FFA), which owned five lots within this historical district. One of these lots approximated 5.9 acres and was the situs of the FFA's office building. Although the 5.9 acres was zoned for residential (classified as R-2), FFA had a special use exception for its commercial office building. But for the special use, the property was zoned residential. If FFA sold the land and building, the special use would not automatically pass to the new owner. The remaining four lots acquired by petitioner were adjacent to the Grist Mill.

During his negotiations for the purchase of the FFA property, petitioner's written offer included his belief that the highest and best use for the property was for either "commercial or a combined commercial and residential (town homes)". Petitioner expressed the further belief that the highest and best use would require rezoning for increased density, but that "the realities of local politics will not allow the highest and best use." The developer of the acquired property would face several

obstacles to development, including compliance with Fairfax County's ordinances and regulations concerning such land development.

On December 12, 1997, and March 27, 1998, FAC acquired the lots from FFA for $2 million. On August 7 and 10, 1998, petitioner, through another entity, purchased, from sellers other than FFA, three additional lots in the Woodlawn Heights historical overlay district for $550,000 and then contributed them to FAC. On August 15, 1999, FAC sold the 5.9-acre parcel, including the FFA building, for $1.6 million. Prior to that sale, Fairfax County Supervisor Gerald Hyland (Hyland) assisted in the rezoning of the 5.9-acre site to a C-2 classification that would permit continued the use of the commercial building on that property. As of the date of the trial in this case, petitioner continued to own one of the acquired unimproved parcels (lot 10), and the remaining parcels[5] that were conglomerated into a 29.3-acre parcel for development that became known as the Grist Mill Woods subdivision (Grist Mill property). Slightly more than half of the property (15.04 acres) is situated in a designated 100-year floodplain and not available for residential development.

---

[5]The Grist Mill Woods subdivision therefore consisted of parcels 15, 16, 17, 18 (exclusive of the 5.9 acres of parcel 18 that included the FFA building), 25, 26, and 27.

The 29.3-acre Grist Mill property was once owned by President Washington and is located within the Woodlawn Heights historical overlay district. Historical overlay districts are subjected to special requirements by the County. President Washington, beginning in 1771, operated the Grist Mill for the purpose of grinding flour and cornmeal for use at his Mount Vernon residence and also for sale along the east coast of the United States, Portugal, and the West Indies. Also located in close proximity to the site was the Woodlawn Plantation that was built in 1805 on land also owned by President Washington. The Grist Mill, Woodlawn Plantation, and the Future Farmers of America (FFA) realty were all located relatively near to Mount Vernon, President Washington's 500-acre residential estate. At the time of trial, Mount Vernon was owned and maintained by the Mount Vernon Ladies' Association (MVLA), a private nonprofit organization. Slightly more than half of the Grist Mill property (15.04 acres) is situated within a designated 100-year floodplain. At all relevant times, the Grist Mill property was zoned R-2 (for residential use).

Development of the Project

The first prerequisite to the proposed development was the need to conform to the general guidelines of Fairfax County. The governance of Fairfax County is vested in its Board of Supervisors (the Board), which, inter alia, establishes county

government policy, passes resolutions and ordinances, and approves land use plans. The Board consists of a chairman and nine additional members called supervisors elected by the citizens of nine Fairfax County districts. At all relevant times, Hyland was the supervisor who had been elected by the citizens of the Mount Vernon District. As of the time of trial, Hyland had served as a supervisor for 18 years.

The Grist Mill property was located in Fairfax County which had a comprehensive zoning plan defining the permitted uses for county property. Two pertinent Fairfax County residential zoning plans are R-2 zoning and planned development housing (PDH) zoning. Under an R-2 zoning an owner would "by-right" be permitted to build two single-family dwelling units per acre. The term "by-right" denotes the property uses available to an owner without requesting a new zoning designation. Greater residential per acre density is permitted under a PDH zoning classification if certain requirements are met, such as the preservation of open space. An owner of property zoned R-2 who wishes to build three units per acre would have to ensure that the comprehensive plan permitted it and then apply to the Board for a rezoning to a PDH or R-3 classification.

During the conglomeration and development of the 29.3-acre parcel, petitioner and others made the representation that 60 dwellings or residences could have been built. In reality, only

approximately 30 could be built under the existing county zoning for the property. It was petitioner's plan to grant a conservation easement to the County that would limit the number of building lots to 30. The claimed conservation easement and the underlying supporting appraisal were based on the assumption that 60 dwellings could be built and the potential for 30 was being given up by the easement. Ultimately, the 29.3 acres were sold without application for or change in the zoning. At the time of the claimed conservation easement, there was only the possibility that the number of buildings or dwellings could have been increased from 30 to a larger number.

The rezoning process can be time consuming, costly, and involves compliance with numerous regulations. For example, even with Hyland's assistance, it took 5 months to obtain a C-2 zoning classification for the FFA property and building. In some instances there may be a need to employ experts such as engineers and surveyors. The rezoning process is initiated by the filing of an application and may involve a public hearing before the planning commission and/or the Board. The Board considers the rezoning request and makes its decision based upon the planning commission recommendations, staff reports, and public testimony at hearings. The cost to pursue a rezoning application in Fairfax County during the late 1990s could have been as much as $20,000-$30,000.

In their review of a rezoning request, the Board considers whether: (1) The environmental sensitivity of the property and the surrounding area would be adversely affected by an increased number of dwelling units per acre; (2) the variation would be consistent with the current use of the neighborhood and surrounding properties; (3) the storm water runoff can be effectively managed; and (4) the neighbors' reaction would be favorable. Organizations or citizen groups concerned about a particular zoning change may attempt to stop or slow the rezoning process. An applicant may be forced to negotiate differences with adverse interests before proceeding with the application process.

In addition, Fairfax County may seek some public benefit in the rezoning process. Occasionally, the rezoning request is coupled with a proffer. A "proffer" is a form of compensation to the county for increased needs such as transportation or public improvement that are necessitated by the rezoning.

The Fairfax County Office of Public Works must also review development and construction plans to ensure that they meet ordinance requirements and public facilities guidelines. One of the concerns of the Office of Public Works is to ensure that the design of developments provides for proper drainage of storm water and certain other safety-related factors. Under certain circumstances, detention ponds are required to ensure a

development does not encroach on or overburden designated floodplain areas.  A developer's obligation to comply with the requirements of the Office of Public Works is called best management practice requirements (BMP requirements).

Because the Grist Mill property was located within a "historical overlay district", it was subject to more stringent regulations than otherwise required by the basic zoning regulations.  The Board has established 13 such historical overlay districts within Fairfax County.  Fairfax County seeks to conserve and improve these historical districts.  Where new structures are being developed within those districts, the county attempts to ensure they comport with the district's historical character.  To assist in the administration of these regulations, the county created an Architectural Review Board (the ARB) consisting of residents with expertise and interest in the preservation of historical sites.  Applications for rezoning and special exceptions or permits within historical overlay districts must be submitted for the ARB's review.  The ARB, in turn, provides its recommendations to Fairfax County agencies for further consideration and review.

At all relevant times, the Grist Mill property was zoned R-2 and was limited to a maximum development of 30 residences.  Of the 29.3 acres, 15.04 acres were in a floodplain and could not be developed.  Accordingly, under an R-2 zoning (two homes per

acre), the Grist Mill property would have been limited to 30 home lots. Additional residential units and/or lots could have been developed under a PDH-3 zoning. Although PDH-3 zoning was permitted under the comprehensive plan, it would have required rezoning approval. A change to PDH-3 zoning would have required the approval of the planning commission, the Mount Vernon Council, the Planning and Zoning Committee, and the Board, and would likely not have been approved without an accompanying proffer. A successful rezoning application would likely have taken at least 6 months and as much as a year for approval. Due to the historical nature of the subject property, petitioner might have faced additional requirements, including review by the ARB.

County Supervisor Hyland was actively involved in the development of the Grist Mill property as part of Fairfax County's revitalization efforts. He was keenly interested in this development because of its potential impact on the surrounding historical sites. For example, during February 1998, petitioner received an offer from the U.S. Postal Service to purchase lot 10 for $1.7 million. Petitioner was enthusiastic about that offer and was inclined to accept it, but Hyland was against the idea, and negotiations failed.

The Mount Vernon Ladies Association was interested in the Grist Mill property development for several reasons. It was concerned about increased future parking needs for the Grist

Mill, and it was planning to renovate the Grist Mill during 1999. If it was unable to acquire the Grist Mill property, MVLA was concerned that an unrelated buyer might operate it in a manner that would interfere with the historical nature of the Grist Mill and other nearby related historical sites. MVLA was specifically concerned about negative impact on the Grist Mill caused by commercial development, and, to a somewhat lesser extent, by possible residential development. After FFA decided to sell its property, MVLA inquired about some of the FFA property, but the negotiations were unsuccessful, and FAC later contracted to purchase all five FFA lots.

Around this same time, petitioner made assurances to MVLA that the proposed development plan would include consideration of MVLA's needs for the preservation and the possible expansion of Mount Vernon and the Grist Mill. Although MVLA's first preference would have been to have no development on the property adjacent to the Grist Mill, it realized that expectation was unrealistic. Therefore, MVLA believed the Grist Mill would be better off with the development of a lesser number of more expensive homes, as opposed to a larger number of less expensive homes. Another concern of MVLA was the maintenance of a sufficient buffer between the Grist Mill and any adjacent development in order to protect the historical view and surroundings of the Grist Mill.

In a letter dated February 3, 1999, MVLA expressed the mistaken view that petitioner could develop the Grist Mill property into at least 60 single-family homes and requested that development be limited to 30 single-family homes. MVLA pointed out that a more expansive development would further impinge upon the historical nature of the Grist Mill. In addition, in a letter dated March 3, 1999, petitioner advised MVLA that he would be willing to donate lot 30 to MVLA for a buffer zone and parking facility if his development proceeded as planned. MVLA, however, had hoped for a larger buffer between petitioner's development and the Grist Mill than the amount it ultimately received.

Woodlawn Plantation wished to protect its historical view so that a visitor's view from the plantation resembled, as closely as possible, the 18th century view. Until 1999, the view from the plantation was limited to the Grist Mill, trees and water, and a small portion of a nearby road. Woodlawn Plantation was concerned about any impact on its view from the development of the Grist Mill property.

### Petitioner's Sales Activity - Grist Mill Property

Beginning sometime in mid-1998, petitioner began to actively pursue the sale of the 29.3-acre Grist Mill property. While attempting to sell the property, petitioner was also attempting to obtain the necessary local government approval for the Grist Mill property development. In a letter dated October 26, 1998,

petitioner requested a waiver of the Fairfax County On-site Stormwater Detention Requirements. The county granted the request on December 31, 1998, so long as petitioner provided channel protection from storm sewer outfalls to Dogue Creek. This was accomplished by a floodplain easement. The required protection could not have been satisfied by means of a conservation easement. Notwithstanding, petitioner indicated in his development plans that he intended to use a conservation easement to satisfy those BMP requirements.

During June 1998, petitioner began discussions for the sale of the Grist Mill property to NVHomes. Petitioner provided NVHomes with a sketch depicting a 62-lot and a 30-lot proposal for development. During July 1998, NVHomes sent petitioner a proposed purchase agreement for the Grist Mill property, envisioning the purchase of approximately 60 fully developed single-family lots. The parties' negotiations collapsed because NVHomes wanted fully developed lots and petitioner's business partner wished to sell the property more quickly than it would take to make the desired improvements.

During October 1998, Centex Homes offered to purchase 41.5 acres of petitioner's property for $2,700,000 conditional on a PDH-2 rezoning that yielded approximately 60 single-family detached lots, but not fewer than 50. Also during October 1998, Batal Builders, Inc., offered to purchase approximately 32.5

acres of petitioner's property for $2,700,000 subject to rezoning that would yield a minimum of 48 lots. In November 1998, the terms of Batal Builders, Inc.'s offer was modified to approximately 32 acres for $2,450,000 not subject to rezoning. Both purchasers were aware that the subject property might be subjected to a conservation easement.

On February 9, 1999, petitioner entered into an agreement with Carl Bernstein, manager of Mount Vernon Development, LLC (MVD), for the sale of the Grist Mill property. The agreement provided for the sale of 29 lots (comprising 32 acres) for $2,800,000. The sale was subject to the possibility that petitioner would donate lot 30 to the MVLA. The sale was also subject to a conservation easement or donation in fee simple of the outlots for recreational use, but the parties recognized that the donation of the outlots "shall not reasonably impair the value of the 30 lots contained within the subdivision of Grist Mill Woods."

Despite these express plans for 30 lots, in a letter dated the next day, February 10, 1999, Hyland requested petitioner consider limiting development of the Grist Mill property to 30 single-family homes. The letter inferred that petitioner could have built 62 lots "by-right". The letter contained the statement that limiting the development to 30 residential units would preserve the historical nature of the Grist Mill and might

provide tax benefits.  The parties to this proceeding acknowledge that the reference to 62 building lots "by-right" was incorrect and would have required rezoning.  Although Hyland signed this letter, petitioner and his advisers had prepared it and requested Hyland to sign it.  Hyland relied on petitioner for the truth or accuracy of the statements in the letter.  At the time Hyland signed the letter, he was unaware that petitioner had plans to develop and sell 30 lots.  Petitioner intended to use the letter to substantiate a tax deduction he planned to take for a conservation easement.

Ultimately, the Grist Mill property was subdivided into 29 residential lots.  Some of the 29 homes built on the Grist Mill property could be seen from the Woodlawn Plantation, especially during the winter and spring months when there is less foliage.

The Grist Mill Woods subdivision plan was approved by the Fairfax County Plan Control Section with an R-2 zoning classification on March 23, 1999.  In a letter dated October 14, 1999, MVLA agreed to the plan and asked the ARB to support petitioner's proposed development of a 30-residence subdivision.  MVLA also stated its understanding that petitioner would donate lot 30 to MVLA for parking at the Grist Mill.  MVLA's letter was based on the language recommended and supplied by petitioner.

On October 14, 1999, the ARB reviewed petitioner's application for the Grist Mill Woods subdivision. The ARB understood that the development plan provided a sufficient buffer between the subdivision and the Grist Mill and that lot 30 would be donated to the Grist Mill. Although the ARB was concerned about the potential for tree loss, ultimately the plans were approved.

### The Conservation Easement and Income Tax Deduction

On December 6, 1999, the same day FAC closed on its sale of the Grist Mill property to MVD, FAC executed a conservation easement deed, which was recorded on December 7, 1999. The deed contained a description of the historical sites adjacent to the Grist Mill property and indicated that MVLA and the Board wished FAC to limit construction of the property to 30 single-family residential lots. It contained the further statement that even though FAC could have built 62 lots based on a PDH subdivision, it voluntarily agreed to limit developing the Grist Mill property to 30 lots to better serve the historic and scenic nature of the Grist Mill. Despite the assertion that 62 lots could have been built, the Grist Mill property was zoned R-2 and no plan for PDH zoning had been approved or was pending before Fairfax County. Neither the Fairfax County Attorney's Office nor MVLA reviewed the deed, and the purported grantee of the conservation easement did not sign or acknowledge the deed.

Petitioners claimed a $342,781 charitable contribution deduction[6] on their 1999 Federal income tax return. The deduction, $1,248,000, was based on a 40-percent[7] share of the conservation easement to Fairfax County which had been valued at $3,120,000. The $3,120,000 value was based on the December 30, 1999, appraisal report prepared by Frank Petroff (Petroff) and was referenced on petitioners' Form 8283, Noncash Charitable Contributions, attached to their return. The appraisal was based, in part, on the February 10, 1999, letter signed by Hyland. In addition, the appraisal was based on the erroneous assumption that the entire Grist Mill property could have been fully developed, including the area consisting of the floodplain. On the "Donee Acknowledgment" part of Form 8283 "Fairfax County Board of Supervisors" was shown as the intended charitable donee, but the acknowledgment signature line was not executed and left blank.

## OPINION

Petitioners claimed a deduction for a contribution of a qualified conservation easement under section 170(h)(1).

---

[6]The deduction was reduced by $905,219 due to an adjusted gross income limitation.

[7]We note that petitioners claimed a deduction based upon a 40-percent share of FAC, although documentary evidence reflected that petitioner was a 60-percent member of FAC. Due to the outcome in this case, the difference between the ownership percentage and claimed contribution deduction percentage need not be reconciled or considered further.

Respondent determined that petitioners were not entitled to the contribution deduction. If we decide that there was a qualified conservation easement, then we must decide its value in order to arrive at the amount of the deduction to which petitioners are entitled. Respondent contends that petitioners have failed to show that their donation satisfies the statutory definition and requirements for a conservation easement deduction. In that regard, respondent contends that there were defects in the conservation easement deed and petitioners' Form 8283 (attached to their return) and no acceptance of the deed or an easement by Fairfax County (the donee named by petitioners). Alternatively, if the Court decides that there was a valid donation, respondent contends that the Grist Mill property was developed according to its highest and best use, and there was, therefore, nothing remaining to contribute as a conservation easement.

Petitioners contend that they have either complied or substantially complied with the reporting requirements for a conservation easement deduction. They also contend that the Grist Mill property had the potential for additional development and that such potential was foregone to preserve the historic nature of the surrounding properties. If we decide that there was no contribution of a qualified conservation easement, we must then decide whether petitioners are subject to an accuracy-related penalty under section 6662. The grounds underlying

respondent's determination for the penalty are, alternatively, that petitioners did not make a qualified contribution or, if a contribution was made, its value was substantially lower than the amount reported on their return.

A.   The Burden of Proof

Generally, the burden of proving or showing error in respondent's determination is upon the taxpayer.  See Rule 142(a).  The burden of proof may shift to respondent in certain situations.  See sec. 7491(a).  Petitioners concede that they bear the burden of showing their entitlement to a conservation easement deduction.  Conversely, respondent concedes that he bears the burden of production with respect to the section 6662 penalty.  See sec. 7491(c).

B.   The Conservation Easement

1.   Background

Section 170(a)(1) allows a deduction for a charitable contribution made during the taxable year.  Generally, section 170(f)(3) does not permit a deduction for a charitable gift of property consisting of less than the donor's entire interest in that property.  An exception applies in the case of a "qualified conservation contribution."  See sec. 170(f)(3)(B)(iii).  A contribution of real property may constitute a qualified conservation contribution if:  (1) The real property is a "qualified real property interest"; (2) the donee is a "qualified

organization"; and (3) the contribution is "exclusively for conservation purposes." Sec. 170(h)(1); see also sec. 1.170A-14(a), Income Tax Regs. To be a qualified conservation contribution, all three requirements must be met.

A "qualified real property interest" must consist of the donor's entire interest in real property (other than a qualified mineral interest) or consist of a remainder interest, or of a restriction granted in perpetuity concerning way(s) the real property may be used. Sec. 170(h)(2). A restriction granted in perpetuity on the use of the property must be based upon legally enforceable restrictions (such as by recording the deed) that will prevent uses of the retained interest in the property that are inconsistent with the conservation purpose of the contribution. See sec. 1.170A-14(g)(1), Income Tax Regs.

A qualified organization is defined in section 170(h)(3) and a contribution is made "exclusively for conservation purposes" if it meets the tests of section 170(h)(4) and (5). This requirement has two parts. First, a contribution is for a conservation purpose if it: (1) Preserves land for the general public's outdoor recreation or education; (2) protects a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem (the natural habitat requirement); (3) preserves open space either for the scenic enjoyment of the general public or pursuant to a Federal, State, or local

governmental conservation policy and yields a significant public benefit (the open space requirement); or (4) preserves a historically important land area or a certified historic structure (the historic preservation requirement). Sec. 170(h)(4)(A); see also sec. 1.170A-14(d)(1), Income Tax Regs. Secondly, the "exclusively for conservation purposes requirement" may be met only if the conservation purpose is protected in perpetuity. Sec. 170(h)(5)(A).

    2. Discussion

        a. Generally

Respondent agrees that the intended donee, Fairfax County, is a qualified organization under section 170(h)(3). The parties continue to dispute whether there was a qualified real property interest and whether the contribution is exclusively for conservation purposes. If petitioners are unsuccessful in showing either that they contributed a qualified interest or that a qualified interest was contributed exclusively for conservation purposes, they will not be entitled to the claimed deduction. If petitioners satisfy both of those two requirements, then we shall decide the value of the conservation easement.

With respect to the third requirement,[8] petitioners contend only that they met the open space and historic preservation

--------

[8]Whether the contribution is made exclusively for conservation purposes.

requirements. We accordingly begin our discussion of the third requirement by considering those two aspects.[9]

b.  Satisfaction of the Third Requirement

In Glass v. Commissioner, 124 T.C. 258, 278-284 (2005), which also involved the contribution of a conservation easement, this Court considered the requirement that a contribution be made exclusively for conservation purposes. The discussion in that case, however, was directed to whether the taxpayer satisfied the natural habitat requirement. That discussion, accordingly, did not focus on the requirements we consider here.[10] Accordingly, we proceed to consider and analyze the two elements in dispute in this case.

(1)  Open Space Requirement

Petitioners allege that they satisfy the open space requirement of section 170(h). Satisfaction of this requirement requires both the preservation of open space and the inurement of a significant public benefit. Sec. 170(h)(4)(A)(iii). The

---

[9]Because we ultimately hold that petitioners have not satisfied the third requirement, there is no need to consider the first requirement or the easement's value.

[10]In addition, because we hold that petitioners do not satisfy either the open space or the historic preservation requirement, we need not consider whether the contribution was "exclusively" for conservation purposes, as we did in Glass v. Commissioner, 124 T.C. 258, 278-284 (2005).

legislative history underlying this statute contains the following relevant examples of uses that may satisfy the open space requirement:

> the preservation of * * * [land] as a public garden * * * (1) the preservation of farmland pursuant to a State program for flood prevention and control; (2) the preservation of a unique natural land formation for the enjoyment of the general public; (3) the preservation of woodland along a Federal highway pursuant to a government program to preserve the appearance of the area so as to maintain the scenic view from the highway; and (4) the preservation of a stretch of undeveloped oceanfront property located between a public highway and the ocean so as to maintain the scenic ocean view from the highway. [S. Rept. 96-1007, at 12 (1980), 1980-2 C.B. 599, 605.]

Generally, the examples provided in the legislative history concern the preservation of the natural state of land. Petitioners' argument addresses this requirement from their viewpoint that the limiting of the Grist Mill property development to 30 lots rather than 62 lots enables it to have "a distinctly open quality." Respondent counters that even if the deed effectively limited development to 30 lots, there were no restrictions placed on open space within the buildable area. Further, there could be no building on the remaining acreage because it was designated floodplain. Accordingly, we agree with respondent's argument.

Petitioners do not contend, nor was it feasible, that residential units could have been built on the floodplain portion of the property. Therefore, a conservation easement, if any,

could only have been carved from the somewhat less than 15 developable acres (outside of the 15.04 acre floodplain area). Assuming arguendo that the deed limited petitioner's development of the Grist Mill property to 30 lots, that limitation, by itself, does not provide additional land that would have been available if the same developable acreage had been divided into 62 lots (such as by use of PDH zoning permitting more housing units per lot). Nothing in the deed limits the size of the homes (either in square footage to protect the amount of buildable land that each can cover, or in height to protect the view from any nearby historical area), or any other development that could have taken place on or adjacent to the Grist Mill property. Moreover, nothing in the deed limits the landowner's ability to seek rezoning to denser development classifications. Accordingly, neither petitioner nor the builder was prohibited from building homes twice the size of those planned for development.

Finally, petitioner's contention that the development did not infringe on any view is without merit. The deed contained no specific provisions to protect the views from the Grist Mill and the Woodlawn Plantation or any other location. The view from those properties were not any more protected if 30 instead of 62 residential units were to be built. The natural state was not protected by the development of 30 rather than 62 units.

Accordingly, petitioners have not satisfied the open space requirement of section 170(h).

(2)  Historic Preservation

We now consider whether petitioners satisfied the third requirement by showing that their contribution comes within the historic preservation requirement of section 170(h).  The historic preservation requirement may be met by showing the preservation of a "historically important land area" or "certified historic structure".  The legislative history underlying this aspect of the statute describes a "historically important land area" as one that is important in its own right or in relation to "historic structures":

> The term "historically important land area" is intended to include independently significant land areas (for example, a civil war battlefield) and historic sites and related land areas, the physical or environmental features of which contribute to the historic or cultural importance and continuing integrity of certified historic structures such as Mount Vernon, or historic districts, such as Waterford, Virginia, or Harper's Ferry, West Virginia.  * * * [S. Rept. 96-1007, supra at 12, 1980-2 C.B. at 605; emphasis added.]

See also sec. 1.170A-14(d)(5), Income Tax Regs.

Petitioners argue that limiting the development of the Grist Mill property promoted the preservation of the historic Grist Mill.  On this point, petitioners reference the open floodplain,[11] the "quiet and peaceful atmosphere" of limited

---

[11]Petitioners' arguments with respect to giving up the right
(continued...)

development, and the requests of Hyland and the MVLA to limit development.  Respondent does not dispute that the Grist Mill property was an "historically important land area".  Respondent contends that there was no "historic structure" on the Grist Mill property that petitioners could have preserved.  In addition, respondent contends that the conservation easement did not preserve the Grist Mill property's "historically important land area" or its natural state.  Respondent also references the loss of trees on the development portion of the Grist Mill property as demonstrating that, in fact, there was a loss of historical importance after the Grist Mill property's development.  Conversely, petitioners strongly deny that they contributed to any loss of historical importance by the removal of trees during the development of the Grist Mill property.

The parties' disagreement about tree loss or removal is irrelevant.  If the trees contributed to the historical importance of the Grist Mill property, the measure should be based on the potential use of the property before and after the contribution of a conservation easement.  Even if no trees were removed by petitioner, such restraint was not mandated by the terms of conservation easement, which failed to reference preservation of trees or the view, but merely referenced a

---

[11](...continued)
to develop and/or to preserve the floodplain ring hollow as no homes could have been built on that land.

development limit of 30 lots.  Accordingly, petitioner's action or inaction with respect to the trees is irrelevant in considering whether the purported conservation easement satisfies the requirements of section 170(h).

The attempted easement did not satisfy the historic preservation requirement of section 170(h) because it did not preserve a historic structure or historically important land area.  First, there was no historical structure on the Grist Mill property to preserve, and the easement's limitation on development on land near the Grist Mill or Woodlawn Plantation does not preserve the historical structures on those properties. That remains so despite any ancillary benefit of limited development because petitioners did not own or control those historical structures.  The legislative history is explicit that land surrounding a historical structure, like Mount Vernon, makes that land historically important, but proximity alone does not provide a basis to support a claim of protection of a historical structure.  Petitioner has not shown how his proposed limitation in the conservation easement preserved any historical structure.

We also note that petitioners are not in a position to claim that the Grist Mill property is independently significant, like a Civil War battlefield, as there is no evidence that anything on the property was historically unique.  The Grist Mill property is thus a historically important land area only because of its

proximity to the Grist Mill and the Woodlawn Plantation. Its physical feature "which [contributed] to the historic or cultural importance" of the surrounding historical properties was its natural state because that natural state provided the separation of the modern world from the 18th century that MVLA and the Woodlawn Plantation were attempting to preserve.

The mere possibility or conjecture of a quieter and more peaceful atmosphere that might have been engendered by limited development did not preserve this historic characteristic. To be sure, there was a more peaceful environment before any development occurred. The requests by Hyland, MVLA, or any other influential groups to limit development simply indicate their desire for a development that would limit the quantity or amount of interference with the historic nature of the community.[12] The influence exerted by these groups only serves to illustrate some of the difficulties that petitioner would encounter in the development of the Grist Mill property. MVLA received a smaller buffer than it had hoped for and no more than would have been mandated by petitioner's inability to build on the defined floodplain. Therefore, petitioners fail to qualify on the basis that they had preserved a historically important land area.

_____

[12]The "requests" by Hyland and MLVA are also entitled to less probative value because of petitioner's role in drafting those letters.

c.  Conclusion

The Senate report on the enactment of the legislation pertaining to conservation easements contains the following explanation:

> [T]he committee believes that provisions allowing deductions for conservation easements should be directed at the preservation of unique or otherwise significant land areas or structures * * * the committee bill would restrict the qualifying contributions where there is no assurance that the public benefit, if any, furthered by the contribution would be substantial enough to justify the allowance of a deduction.  * * *  [S. Rept. 96-1007, supra at 9-10, 1980-2 C.B. at 603.]

With respect to the Grist Mill property, the record does not support a finding that any public benefit would be furthered by petitioners' claimed[13] conservation easement.  We need not decide whether petitioner's choice not to pursue a rezoning for more intense development was due to:  The realization that the rezoning would not get approved, his business partner's desire to quickly sell the property, or a desire to benefit the community. Here there has been no preservation of open space.  Nor have petitioners preserved anything that is historically unique about the Grist Mill property or the surrounding historical areas. Petitioner simply developed the Grist Mill property to its maximum yield within the property's zoning classification.

---

[13]In effect, petitioner was attempting to self-impose a limitation that was already imposed by the zoning classification and requirements of Fairfax County.

Petitioners have therefore satisfied neither the open space requirement nor the historic preservation subdivision requirements of the third requirement for qualification as a deductible conservation easement. Accordingly, petitioners are not entitled to a deduction for a qualified conservation easement under section 170(h) because the attempted grant did not satisfy the conservation purposes required under section 170(h)(4)(A).

C. Penalty

Respondent determined that petitioners were liable for a 20-percent accuracy-related penalty under section 6662(a) due to (1) negligence or disregard of rules or regulations, (2) a substantial understatement of income tax, or (3) a substantial valuation overstatement, and, to the extent that a portion of the underpayment was attributable to a gross valuation misstatement, an increased penalty of 40 percent under section 6662(h). Respondent has conceded, for the purposes of this case, that if we find that petitioners have not made a qualified conservation contribution under section 170(h) that the gross valuation misstatement penalty does not apply, and that only the negligence or substantial understatement penalty applies. Because we have found that petitioners have not made a qualified conservation contribution, we consider only whether petitioners are liable for either the negligence or substantial understatement penalty.

Section 6662(a) provides that if any portion of an underpayment is due to negligence, then a taxpayer will be liable for a penalty equal to 20 percent of the underpayment that is attributable to negligence. "Negligence" is defined as "the lack of due care or failure to do what a reasonable and ordinarily prudent person would do" under the circumstances. Niedringhaus v. Commissioner, 99 T.C. 202, 221 (1992). "Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Id.; sec. 1.6662-3(b)(1), Income Tax Regs. Respondent concedes that he has the burden of production with respect to the penalty. In that regard, respondent "must come forward with sufficient evidence indicating that it is appropriate to impose" the accuracy-related penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

Conversely, petitioners' contend that they are not liable for the section 6662 penalty because they satisfied all of the reporting requirements for a contribution deduction with the perfunctory exception that the donee did not sign the acknowledgment on the Form 8283. Petitioners also contend that there was no person in Fairfax County who was authorized to sign the Form 8283. However, petitioners' failure to obtain a signature is not the sole basis for respondent's determined penalty. As a basis to support the determined penalty, respondent places heavy reliance upon the invalid premise in

Hyland's February 10, 1999, letter that 62 lots could have been developed. Respondent argues that Petroff (the appraiser), in arriving at his property valuation, relied on the false premise in the February 10 letter that petitioner could have built 62 lots "by-right". More significantly, however, respondent argues that Petroff's assumption was that petitioner could have built the additional 32 lots in the floodplain.

Petitioners represented to respondent, through Petroff's appraisal report, that the entire Grist Mill property could be developed and that the conservation easement had been placed on the floodplain, which, in fact, petitioner knew was unavailable for development. The evidence shows, without doubt, that the property was zoned R-2 and limited to 30 units, and approximately one-half of the Grist Mill property was floodplain on which no development was permitted. Most importantly, petitioner knew at the time of filing the return that the assumption that the existing R-2 zoning allowed the development of 62 lots on the Grist Mill property was false. Petitioners have shown a lack of care and due regard in claiming a deduction based on assumptions known to be false or erroneous.

The accuracy-related penalty may be avoided by showing that (1) there was reasonable cause for the underpayment, and (2) the taxpayer acted in good faith with respect to such underpayment. Sec. 6664(c)(1). Whether a taxpayer acted with reasonable cause

and in good faith is made on a case-by-case basis based on the facts and circumstances. Reliance on an appraisal of the value of property does not necessarily demonstrate reasonable cause and good faith, depending on the assumptions made in the appraisal. Sec. 1.6664-4(b)(1), Income Tax Regs. For example, the appraisal may not be based on an assumption that the taxpayer knows, or has reason to know, is unlikely to be true. Sec. 1.6664-4(c)(1)(ii), (2), Income Tax Regs.

Respondent argues that petitioner knew the statement in the letter was incorrect when supplying the letter to the appraiser. Respondent therefore argues that petitioner did not in good faith rely on Petroff's appraisal of the Grist Mill property. Petitioners' counter respondent's argument by contending that the conservation easement deed contains no references to a donation of floodplain property, but instead a limitation to build on 30 lots or less, and that petitioners have not attempted to take a donation based on an assertion that homes could have been built in the floodplain.

We agree that the issue of whether petitioner could have built 62 lots "by-right" is of less concern if the valuation was conducted on the theory that the property could have been rezoned. However, despite petitioners' contentions, by submitting Petroff's appraisal, petitioners indicated to respondent that they could have built on the floodplain.

Irrespective of their position at trial, we must consider the reasonableness of petitioners' position based upon their position at the time the return was filed. Petroff's appraisal report does contain the premise that the floodplain could have been developed in the absence of the easement, and it was this report that petitioners relied upon and presented to respondent to support their contribution.

Although the report does not contain the express statement that the entire 29 plus acres could have been developed in the absence of the easement or that the conservation easement was placed on the floodplain, it can be readily inferred from Petroff's report that he assumed these to be facts. Petroff's report contains the statement that the "by-right" subdivision plan allowed 62 lots to be built on the total 29.2722 acres, a development that we can infer Petroff believed was permitted under the R-2 classification. The report also contains the statement that the conservation easement was "donated on a 15.0418 acre portion of the 29.2722 acre" Grist Mill property, which is the same acreage as the existing floodplain. The report further notes that this constitutes 51.4 percent of the Grist Mill property, representing 32 lots. It also refers to the entire 29.2722 acres of the Grist Mill property before the easement, the 15.0418 acres of the conservation easement, and then the "Area of Remainder after Conservation Easement" of

14.2304 acres, insinuating that only 14.2304 acres of buildable land are available because of the placement of the conservation easement. However, petitioner acknowledges that the conservation easement did not restrict any more buildable land in total than what was available before the purported easement. Finally, the report assumes the same 2.11-unit-per-acre yield for both 62 and 30 lots before and after the donation of the conservation easement.

Petitioners argue that the deed attached to both Petroff's report and the Form 8283 does not make any reference to 62 lots that could be developed "by-right". While that is correct, neither does the deed state where the easement is located. Accordingly, Petroff would have assumed that 62 lots could have been built on the entire 29.2722 acres absent the easement, and that the floodplain (on which there could be no development) was where the conservation easement was placed.

The only part of Petroff's report that could possibly support petitioners' position that the valuation of the 62 lots was based on rezoning was Petroff's reference to the valuation's being based on the 62-lot sketch in the addendum to his appraisal. This is the same 62-lot rezoning sketch of the buildable area upon which petitioners' trial experts based their opinions of the value of the Grist Mill property. However, a 30-lot sketch was not provided in Petroff's appraisal, and there is

no indication in his report that the 62-lot sketch was based on a rezoning of the buildable area. Thus, the sketch in the addendum, by itself, was not sufficient to provide the correct circumstances to Petroff. More importantly, the report and addendum did not inform respondent of these matters or intention.

Petroff's appraisal is filled with a sufficient number of instances showing that he relied on the incorrect or false assumption that the entire 29 plus acres could be developed in the absence of the easement and that the conservation easement had been placed on the unbuildable 15 plus acres of floodplain. Petitioner, who was familiar with and heavily involved in the development of the Grist Mill property, knew that the floodplain could not be developed and that any conservation easement would have to be placed on the buildable land. A casual review of Petroff's report would have alerted petitioner to the fact that the valuation was based on erroneous assumptions. Petitioners cannot therefore rely on this report as reasonable cause for taking the position they did on their income tax return. See sec. 1.6664-4(c)(2), Income Tax Regs. In addition, petitioners cannot rely on the expert reports prepared in anticipation of trial to show reasonable cause because these reports are not

evidence of petitioners' position at the time of the filing of their return.  Accordingly, the section 6662 negligence penalty is sustained.

<u>Decision will be entered</u>

<u>under Rule 155.</u>