*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0464p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CHARLES and SUSAN GLASS,
  *Petitioners-Appellees,*

  *v.*

COMMISSIONER OF INTERNAL REVENUE,
  *Respondent-Appellant.*

No. 06-1398

On Appeal from the Decision
of the United States Tax Court.
No. 99-17878.

Argued: November 29, 2006

Decided and Filed:  December 21, 2006

Before:  DAUGHTREY and GIBBONS, Circuit Judges; EDMUNDS, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Bethany B. Hauser, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.  Charles F. Glass, Harbor Springs, Michigan, pro se.  Stephen J. Small, Boston, Massachusetts, for Amicus Curiae.  **ON BRIEF:** Bethany B. Hauser, Kenneth L. Green, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.  Charles F. Glass, Susan Glass, Harbor Springs, Michigan, pro se.  Stephen J. Small, Boston, Massachusetts, for Amicus Curiae.

_____

**OPINION**

_____

EDMUNDS, District Judge.  On 1992 and 1993 tax returns, Charles and Susan Glass ("Taxpayers") claimed charitable deductions for two conservation easements.  The Commissioner of Internal Revenue (the "Commissioner") issued a notice of deficiency.  Taxpayers filed a petition in the Tax Court challenging the Commissioner's decision.  The Commissioner conceded that the 1992 and 1993 contributions met two of the three requirements for a "qualified conservation contribution" under the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 170(h)(1); i.e., that the portions of the Glass property covered by each conservation easement is a "qualified real property interest" and that the donee, Little Traverse Conservancy ("LTC"), is a "qualified organization."

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

The Commissioner's challenge focused on the third requirement, that the conservation easements be "exclusively for conservation purposes."

The Tax Court concluded that the conservation easements were qualified conservation contributions under I.R.C. § 170(h)(1) because (1) they protect a relatively natural habitat of plants or wildlife as required by I.R.C. § 170(h)(4)(A)(ii); and (2) LTC, or any subsequent holder of the conservation easements, holds or will hold the conservation easements exclusively for conservation purposes as required by I.R.C. § 170(h)(5). The Commissioner appeals the decision of the Tax Court. Because the Tax Court's factual findings were not clearly erroneous and there was no error in its application of the law, we AFFIRM the decision of the Tax Court.

## I.      Background

### A.      Taxpayers' Property and Its Surroundings

In 1988, Taxpayers purchased, for $283,000, a ten-acre parcel of land in Emmet County, Michigan, between Harbor Springs and Cross Village. *Glass v. Comm'r*, 124 T.C. 258, 260 (2005). The property sits along the shoreline of Lake Michigan. *Id.* It was originally purchased and used as a vacation home. In 1994, Taxpayers began using the property as their primary residence. *Id.* at 261. From 1995 through 1999, Taxpayers lived part time at the Emmet property and part time in their secondary residence in Grosse Pointe Farms, Michigan. In 1999 or 2000, they began to live full time at the Emmet property. *Id.* The same three buildings that were on the property in 1988 remain. These include (1) Taxpayers' home, a 1,278 square foot, "single-story small handcrafted cabin that is made of hand-hewn logs and elm bark shaving"; (2) a 512 square foot, single-story guest cottage; and (3) a 525 square foot, single-story garage. *Id.*

The Tax Court gave a thorough description of the property:

The property's dimensions are generally 460 feet in width from north to south and 1,055 feet in depth from east to west. Its eastern edge is a straight line bordering Highway M-119 (M-119). Its western edge is a crooked line abutting Lake Michigan. Lake Michigan cannot be seen through the property from M-119 because many large trees and dense foliage grow throughout much of the property. Included among the trees on the property is a plantation of large (approximately 100-foot) old growth original white pine trees.

A portion of the property that generally includes the property's total width and extends approximately 900 feet from M-119 is relatively flat and is generally open, grassy, and well lawned around [Taxpayers'] home and wooded and bushy in other places, especially along M-119. The rest of the property (approximately 155 feet in depth and 460 feet in width) slopes down a steep bluff at an angle of about 100 degrees to the shoreline of Lake Michigan or, more specifically, to Lake Michigan's ordinary high water mark. The bluff is approximately 100 feet high, and a stairway goes down it to the shoreline. The shoreline is level and consists of rocks, sand, grass, and weeds. The side of the bluff contains many trees (e.g., white pine, cedar, spruce, oak, maple, balsam fir) and dense vegetation (e.g., juniper bushes and other shrubs).

[Taxpayers]' home on the property is sited on relatively flat land on the top of the bluff approximately 45 to 50 feet from the edge at the top of the bluff. . . .

Species of plants that grow on the Lake Michigan shoreline in northern Emmet County include Lake Huron tansy and pitcher's thistle. These plants are considered

to be threatened and require undisturbed habitats to survive. Birds on that shoreline include bald eagles, piping plovers, and kingfishers. . . .

In the early 1990s, bald eagles were returning to the Lake Michigan shoreline on and near the property, and the presence of bald eagles along that shoreline is more common today than in earlier years, when it was unusual to see an eagle on that shoreline. . . . The property also has attracted kingfishers and has Lake Huron tansy growing on it, especially on the bluff. The property is not an ideal habitat for Lake Huron tansy or pitcher's thistle, another threatened species of plant, but the property, in its natural state, allows for the creation or promotion of the habitat of those species as well as the habitat of bald eagles and piping plovers.

*Id.* at 261-62 (footnotes omitted).

In 1992 and 1993, Taxpayers' property was located in two different land use zones: scenic resource 2 (SR-2) and recreation residential 2 (RR-2). The easternmost 400 feet along M-119 was classified SR-2, allowing for single-family homes with a minimum lot size of 30,000 square feet. The portion of Taxpayers' property zoned SR-2 "was large enough that it could probably be divided into four building lots of 30,000 square feet each." *Id.* at 264. The remainder of Taxpayers' property was classified RR-2, requiring a minimum lot size of 22,000 square feet and 100 feet of frontage, and "designed to accommodate cottage and seasonal home development." *Id.* at 265. "The portion of the property zoned RR-2 also included from the high water mark a 60-foot waterfront setback in which building or development was not allowed. The conservation easement included space that was within this 60-foot limitation." *Id.*

The Tax Court also described the area surrounding Taxpayers' property:

The Lake Michigan shoreline from north of Harbor Springs to Cross Village is generally developed only for residential and related purposes. Most of that shoreline is privately owned with single family vacation homes. Approximately one home is sited on that shoreline every 250 feet in the half mile north of the property and in the half mile south of the property; i.e., approximately 21 homes are in the immediate 1-mile vicinity of the property.

The typical use of the land in the immediate vicinity of the property is for single-family dwellings. [Taxpayers]' neighbors to the north, for example, built a large home on two parcels of land that cover approximately 400 feet of lakefront. A number of high density developments with either lakefront or back lots are also found on the land in the immediate vicinity of the property. . . . Such developments are not the norm in the area of the property; single family homes and cottages are.

The nearest public access to the shoreline on the property is approximately 1.5 miles to the south at Readmond Township Park in Readmond. Readmond is approximately 40 square miles, is approximately 10 miles north of Harbor Springs (the nearest incorporated city), and is in Emmet County. . . . .

The Readmond Township Park is a small park that is publicly owned by Readmond. It has in it a picnic table, a sandy beach with approximately 200 feet of frontage, and limited parking for approximately 15 cars. On both sides of the park are private homes which extend down to the water. No incorporated cities are found to the north of Readmond.

The nearest public access to the shoreline to the north of the property is approximately 4 miles away in Cross Village. Cross Village is in Emmet County and

is also the nearest public access for boats to enter Lake Michigan. The public area in Cross Village includes 200 to 300 feet of lakefront property.

\* \* \* \*

Some homes in Emmet County were built on the bluff along Lake Michigan. The construction of a home on a bluff on or near the property interferes with the bluff's natural scenic beauty. It also interferes with and destroys the natural habitat of wildlife or plants that live or grow naturally on or near the bluff. There also are risks of a landslide in building on or near a bluff.

\* \* \* \*

Few people walk the Lake Michigan shoreline in Emmet County at times other than in the summer. In the summer (primarily July and August), many people walk that shoreline, . . . up to the ordinary high water mark. . . . The people who walk the shoreline on or near the property are generally neighboring landowners (or the renters of homes on that land), family, or friends.

*Id.* at 263-64, 265, 266 (footnotes omitted).

## B.    Taxpayers' Grant of Conservation Easements to LTC

Little Traverse Conservancy is a Michigan nonprofit organization that is exempt from federal income tax under I.R.C. § 501(c)(3). *Id.* at 274. Its purpose "is to protect the natural integrity and scenic beauty of northern Michigan for the enjoyment of future generations." *Id.* It accomplishes this purpose by acquiring property by contribution or purchase and by educating the public. *Id.*

The LTC actively sought contributions of conservation easements in the area along the M-119 corridor and the Lake Michigan shoreline. The executive director of the LTC testified that contributions of conservation easements to the LTC Conservation Trust ("Trust") were actively sought in the early 1990s because the LTC felt overdevelopment threatened the natural scenic beauty of the Lake Michigan bluffs, the return of bald eagles to the Lake Michigan shoreline, and survival of plant species like the Lake Huron tansy and pitcher's thistle along the area beaches. *Id.* As the Tax Court explained, "LTC believes that northern Michigan is relatively undeveloped as compared with other parts of the State. Significant and abundant natural resources are present in northern Michigan, particularly around M-119 and the nearby shoreline, and LTC believes that these resources may be threatened by overdevelopment." *Id.* at 273. It was LTC's goal "to balance a development of northern Michigan with a development of new nature preserves and the protection of areas for wildlife and scenic views." *Id.*

A typical contribution of a conservation easement to the LTC also includes a cash contribution to help LTC to monitor and enforce its terms. "LTC does not on an annual basis formally monitor each conservation easement that it receives to ensure compliance but occasionally monitors them informally. LTC maintains a file for each of these easements." *Id.* at 275.

Taxpayers made three contributions of Conservation Easements to the LTC Trust; one each in 1990, 1992, and 1993. The 1990 Conservation Easement is not at issue here.[1] The 1992 and 1993 contributions of Conservation Easements are at issue and are described below.

### 1.          1992 Conservation Easement

On December 28, 1992, Taxpayers signed a document entitled "Conservation Easement" which was recorded at the Register of Deeds for Emmet County the following day. LTC prepared the deed contemporaneously with Taxpayers' contribution of the 1992 Conservation Easement in perpetuity to the LTC Trust. At the same time, Taxpayers also contributed $2,000 to the LTC Trust. *Id.* at 267-68.

The 1992 Conservation Easement covers the "northernmost 150 feet of shoreline and all portions landward for 120 feet from the ordinary high water mark" of Taxpayers' property. *Id.* at 268. It provides that: (1) the encumbered property "'contains a relatively intact forested ecosystem, providing wildlife habitat, as well as habitat for old growth white pine trees'"; (2) "'lake front property in and around the area of the [encumbered] Property is under intense development pressure, thereby causing or at least exacerbating the impact on rare and protected flora and fauna of the area such as the piping plover . . . and Huron Tansy'"; (3) Taxpayers and LTC "'recognize the scenic and natural resource values of the Property and share the common intention to conserve these values in perpetuity by the conveyance of a Conservation Easement to protect the use or development of the Property for any purpose or in any manner which would conflict with the maintenance of these scenic and natural resource values'"; and (4) Taxpayers intend to convey to LTC "'the right to preserve and protect the scenic and natural resource values of the Property in perpetuity.'" *Id.* (quoting 1992 Conservation Easement at 1.)

The 1992 Conservation Easement states that its purpose:

> "is to ensure that the scenic and natural resource values of the Property will be retained forever. This Conservation Easement is intended to prevent the use or development of the Property for any purpose or in any manner which conflicts with the perpetual maintenance of these scenic and natural resource values. By executing this Conservation Easement, [Taxpayers] acknowledge they are giving up development rights associated with the Property. In addition, this Conservation Easement includes covenants on the part of the [Taxpayers] to refrain from doing certain acts, as set forth below, so that all uses of the Property will be consistent with this Conservation Easement. [LTC] accepts this Conservation Easement to conserve the natural resources and scenic values of the Property for the present and future generations. The parties acknowledge that this Conservation Easement constitutes a servitude upon the land and runs with the land."

*Id.* (quoting 1992 Conservation Easement, ¶ 1.0.) It precludes "[a]ny activity on or use of the Property that is inconsistent with" the above-stated purpose. Joint Appendix ("JA") at 121 (1992 Conservation Easement, ¶ 2.0). It also includes a non-exhaustive list of restricted uses; e.g., mining activities and, except as otherwise provided therein, "development, construction, improvement, or similar acts that would destroy any part" of the encumbered property. *Id.* The encumbered property may not be partitioned or divided for any purpose; no rights-of-way, easements of ingress or egress, driveways or roads can be constructed, developed or maintained; no trash, garbage, toxic or

---

[1] The 1990 Conservation Easement "covers the approximately 2.64 acres of [Taxpayers'] property consisting of the width of the property at M-119 and 250 feet inland towards Lake Michigan." *Glass*, 124 T.C. at 267. It "generally restricts the building, construction, development, or removal of trees on the" encumbered property but "allows for the building of (and removal of trees for) a 3,200-square-foot garage/work space/studio and related access road." *Id.*

hazardous waste, or unsightly materials can be placed on or stored there; the surface cannot be disturbed, except to perform permitted uses described in ¶ 3.0; no living trees, shrubs or other vegetation can be cut or removed except as permitted under ¶ 3.0; no all-terrain or similar vehicles can use the property; and there can be no manipulation or alteration of the natural water courses through the property; e.g., a dike, drain or fill. *Id.*

Certain uses not inconsistent with the above-stated purpose were permitted including, e.g., limited rights "to selectively move, prune, trim or cut trees, shrubs or other vegetation" for purposes of preserving the view of Lake Michigan or for safety; "to maintain, repair and replace the existing foot path to the beach" or "to construct, maintain, repair and replace additional foot paths to the beach;" "to construct, maintain, repair and replace a day shelter, storage shed, scenic overlook deck, patio" or "a wooden boat house in a manner and location which minimizes interference with the scenic and natural resource value of the Property;" and "to make wildlife habitat improvements." *Id.* at 122 (1992 Conservation Easement, ¶ 3.0). As to the existing cottage located outside the Conservation Easement, the Taxpayers retained:

> The right to build addition(s) onto the existing cottage located east of and adjacent to the Property provided that (1) the encroachment of the addition(s) is only incidental to the existing cottage's overall size and location and (2) the maximum square footage of the existing cottage and any addition(s) shall not exceed five thousand (5,000) square feet.

*Id.* Possible replacement of the existing cottage was also addressed:

> If the existing cottage located east of and adjacent to the Property is replaced, the right to build a portion of such replacement structure on the Property provided that (1) the replacement structure is located in substantially the same location as the existing cottage (2) the encroachment of the replacement structure onto the Property is only incidental to the replacement structure's overall size and location and (3) the maximum square footage of the replacement structure does not exceed five thousand (5,000) square feet.

*Id.* There is no restriction on the Taxpayers' "right to develop any part of the property not covered by" the 1992 Conservation Easement. *Glass*, 124 T.C. at 269.

To ensure Taxpayers' compliance and to accomplish its purpose, the Conservation Easement granted LTC certain rights: to enter the encumbered Property to document its condition, to monitor compliance, to enforce its terms, "to conduct scientific or related investigations," "to undertake corrective action" if there is a violation, "to prevent any activity on or use of" the encumbered Property "that is or may be inconsistent with" its provisions, and "to require restoration of all areas or features" of the encumbered Property damaged by any inconsistent use or activity. JA at 122 (1992 Conservation Easement, ¶ 4.0). The document "generally states that [Taxpayers] are liable for any cost incurred by LTC to enforce" the Conservation Easement and that it will be terminated "'[i]f subsequent, unexpected changes in the Property, or nearby property, render the Purpose of this Conservation Easement impossible to achieve.'" *Glass*, 124 T.C. at 269 (quoting 1992 Conservation Easement, ¶¶ 5.0, 10.0).

The 1992 Conservation Easement also restricts LTC's right to transfer or otherwise assign the Easement only to:

> a qualified conservation organization which agrees to enforce this Conservation Easement in accordance with the regulations established by the Internal Revenue Service governing such transfers and the laws of the State of Michigan. If [LTC] ceases to exist, [LTC]'s rights and obligations under this Conservation Easement

shall immediately vest in the following entities in the following order to the extent they evince an intent to accept this Conservation Easement: (a) The Nature Conservancy, (b) the Michigan Department of Natural Resources or (c) any other appropriate organization which qualifies under Section 170(h)(3) of the Code, has conservation purposes, and is qualified to accept and hold this Conservation Easement either voluntarily or through an award of such right by a court of competent jurisdiction under the doctrine of *cy pres.*

JA. at 124 (1992 Conservation Easement, ¶ 8.0.1).

### 2.          1993 Conservation Easement

On December 28, 1993, Taxpayers signed a document entitled "Lakefront Conservation Easement #2" which was recorded at the Register of Deeds for Emmet County on December 30, 1993, and re-recorded there on November 24, 1994. LTC prepared Easement #2 contemporaneously with Taxpayers' contribution of Conservation Easement #2 in perpetuity to the LTC Trust. At the same time, Taxpayers also contributed $2,000 to the LTC Trust. "On December 30, 1993, a mortgagee of the property agreed to subordinate its mortgage on the property to the extent necessary to permit LTC to enforce the purpose of the conservation easement 2 in perpetuity." *Glass*, 124 T.C. at 270.

The 1993 Conservation Easement covers the "southernmost 260 feet of shoreline and all portions landward for 120 feet from the ordinary high water mark" of Taxpayers' property. *Id.* It includes largely the same language as the 1992 Conservation Easement. *Id.*

The stated purpose of the 1993 Conservation Easement is the same as in the 1992 Conservation Easement and similarly precludes any activity or use that is inconsistent with the stated purpose. JA at 131 (1993 Conservation Easement). The non-exhaustive list of restricted uses is identical to those in the 1992 Conservation Easement. *Id.* at 132-33. The permitted uses are also the same with the following exceptions: (1) there is no right to maintain, repair, replace, or construct any foot path; and (2) rather than the right to add to or possibly replace the existing cottage, the same language is used to allow additions to or possible replacement of the existing guest cottage so long as it remains in substantially the same location and does not exceed 2,500 square feet. *Id.* at 132. There is no restriction on the Taxpayers' "right to develop any part of the property not covered by" the 1993 Conservation Easement. *Glass*, 124 T.C. at 271.

The 1993 Conservation Easement also grants LTC the same rights to enforce compliance with the terms of the easement so that its purpose may be accomplished and similarly restricts LTC's right to transfer or otherwise assign the easement. JA at 133-34 (1993 Conservation Easement).

### C.          Claimed Deductions and IRS Notice of Deficiency

On their 1992 federal income tax return, Taxpayers claimed that the 1992 Conservation Easement to LTC was a noncash charitable contribution with a fair market value of $99,000. They also claimed other cash contributions totaling $9,957, $2,000 of which was given to LTC. Taxpayers used $95,569 of the contributions in 1992 and $13,388 was carried over to 1993.

On their 1993 federal income tax return, Taxpayers claimed that the 1993 Conservation Easement to LTC was a noncash charitable contribution with a fair market value of $241,800. They also claimed $11,414 in cash contributions, and the $13,388 carryover. Taxpayers used $128,473 on their 1993 return and carried over the balance to 1994 and 1995.

On August 27, 1999, the IRS issued Taxpayers a notice of deficiency for tax years 1992 through 1995. It determined that Taxpayers were not entitled to the deductions for the 1992 and

1993 Conservation Easements because they did not qualify as "qualified conservation contributions" within the meaning of I.R.C. §§ 170(h), (h)(4)(A), and (h)(1)(C). The IRS further determined that, even if allowable, the claimed deductions were based on an inflated fair market value.

Taxpayers filed a petition in the Tax Court for a redetermination of the deficiencies of $26,539; $40,175; $26,193; and $22,771 asserted against them for 1992, 1993, 1994, and 1995, respectively. *Glass*, 124 T.C. at 259. The Tax Court severed the question of the Easements' fair market values from the question whether the 1992 and 1993 Conservation Easements constituted "qualified conservation contributions" within the meaning of the I.R.C. § 170(h)(1). The valuation issue is not before this Court.

## II.     Analysis

### A.     Standard of Review

The Tax Court's findings of fact are reviewed for clear error, and its application of the law to the facts is reviewed *de novo*. *Ekman v. Comm'r*, 184 F.3d 522, 524 (6th Cir. 1999). This appeal arises from Taxpayers' challenge of deficiency determinations by the Commissioner. "The Commissioner's deficiency determinations are presumed correct and the taxpayer bears the burden of proving otherwise." *Id.* Moreover, "[d]eductions are a matter of legislative grace, and the taxpayer must satisfy the specific statutory requirements claimed to reduce a tax liability." *Id.* at 524-25.

### B.     Statutory Framework

Under I.R.C. § 170(a)(1), a deduction is allowed for a charitable contribution made during the tax year. As to charitable gifts of property, a taxpayer is generally not allowed to take a deduction if the charitable gift consists of less than the taxpayer's entire interest in that property. I.R.C. § 170(f)(3). There is an exception to this general rule for a "qualified conservation contribution." I.R.C. § 170(f)(3)(B)(iii).

The definition of a "qualified conservation contribution" is provided in Section 170(h). To constitute a qualified conservation contribution, the taxpayer must show that three requirements have been satisfied: "(1) [t]he real property is a 'qualified real property interest'; (2) the donee is a 'qualified organization'; and (3) the contribution is 'exclusively for conservation purposes.'" *Turner v. Comm'r*, 126 T.C. 299, 311 (2006) (citing I.R.C. § 170(h)(1) and 26 C.F.R. 1.170A-14(g)(1)). Only the third requirement is at issue in this appeal.

This third requirement, that a contribution is made "exclusively for conservation purposes," is met if the taxpayer shows that the contribution satisfies I.R.C. § 170(h)(4) and (5). *Id.* As to Section 170(h)(4), subsection (h)(4)(A)(ii) is at issue here. It defines "conservation purpose" as "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem." I.R.C. § 170(h)(4)(A)(ii). *See also* 26 C.F.R. ("Treas. Reg.") § 1.170A-14(d)(1)(ii). The Treasury Regulations implementing this section further provide that:

> (i) *In General*. The donation of a qualified real property interest to protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem normally lives will meet the conservation purposes test of this section. The fact that the habitat or environment has been altered to some extent by human activity will not result in a deduction being denied under this section if the fish, wildlife, or plants continue to exist there in a relatively natural state.

(ii) *Significant habitat or ecosystem.* Significant habitats and ecosystems include, but are not limited to, habitats for rare, endangered, or threatened species of animal, fish, or plants; . . . .

(iii) *Access.* Limitations on public access to property that is subject to a donation under this paragraph (d)(3) shall not render the donation non-deductible.

Treas. Reg. § 1.170A-14(d)(3).

As to Section 170(h)(5), subsection (h)(5)(A) is at issue here. It provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." I.R.C. § 170(h)(5)(A). The Treasury Regulations implementing § 170(h)(5)(A) provide that:

(1) *In general.* To meet the requirements of this section, a donation must be exclusively for conservation purposes. See paragraphs (c)(1) [Qualified Organization – Eligible donee] and (g)(1) through (g)(6)(ii) of this section [Conservation Purpose Enforceable in perpetuity]. . . .

(2) *Inconsistent use.* . . . [A] deduction will not be allowed if the contribution would accomplish one of the enumerated conservation purposes but would permit destruction of other significant conservation interests. . . . However, this requirement is not intended to prohibit uses of the property, . . . if, under the circumstances, those uses do not impair significant conservation interests.

(3) *Inconsistent use permitted.* A use that is destructive of conservation interests will be permitted only if such use is necessary for the protection of the conservation interests that are the subject of the contribution. . . . A donor may continue a pre-existing use of the property that does not conflict with the conservation purposes of the gift.

Treas. Reg. § 1.170A-14(e)(1)-(3).

### C.     Tax Court Decision

The Tax Court held that Taxpayers' contributions of the 1992 and 1993 Conservation Easements were qualified conservation contributions under I.R.C. § 170(h)(1). *Glass*, 124 T.C. at 259. It observed that the Commissioner had conceded that the first and second requirements of § 170(h)(1) were satisfied, *id.* at 280, and concluded that Taxpayers met the third requirement – that the contribution be "exclusively for conservation purposes" – because "they protect a relatively natural habitat of wildlife and plants," as required under § 170(h)(4)(A)(ii), and "are exclusively for conservation purposes," as required under § 170(h)(5). *Id.* at 280-84.

### D.     Discussion

The sole issue on appeal is whether the Tax Court erred when it held that Taxpayers' 1992 and 1993 contributions of Conservation Easements satisfied the third requirement of I.R.C. § 170(h)(1).

The Commissioner first argues that the Tax Court's construction of Treas. Reg. § 1.170A-14(d)(3)(i) and (ii)  was erroneous because it read the word "significant" out of the Treasury Regulation and thus erred in concluding that the encumbered property satisfied I.R.C. § 170(h)(4)(A)(ii). The Commissioner next argues that the Tax Court's findings that the encumbered property fell within Treas. Reg. § 1.170A-14(d)(3)(i) were clearly erroneous because

the encumbered property was too small, allowed Taxpayers too many retained rights, and failed to restrict the building rights of neighboring property owners thus precluding the Easements from serving their stated conservation purpose. Finally, using these same arguments, the Commissioner asserts that the Tax Court erred in finding that the Easements' conservation purpose was protected in perpetuity and that the deductions were "exclusively for conservation purposes" as required under I.R.C. § 170(h)(5)(A) and Treas. Reg. § 1.170A-14(e), (g).

For the reasons stated below, we affirm the decision of the Tax Court.

### 1.        "Significant Relatively Natural Habitat" Under I.R.C. § 170(h)(4)(A)(ii)

The Tax Court examined Taxpayers' claim that the Conservation Easements protect a relatively natural habitat of wildlife or plants thus falling within the acceptable conservation purposes of I.R.C. § 170(h)(4)(A)(ii). *Glass*, 124 T.C. at 280. It observed that the Treasury Regulation implementing that statutory provision provides that "a qualified real property interest will meet the conservation purpose test, and thus satisfy the third requirement . . ., if that interest is contributed 'to protect a significant relatively natural habitat in which a fish, wildlife, or plant community, or similar ecosystem, normally lives'." *Id.* (quoting Treas. Reg. § 1.170A-14(d)(3)(i)). The Tax Court further observed that the Regulation lists examples of significant habitats and ecosystems and expressly includes habitats for rare, endangered, or threatened species of animals, fish, or plants. *Id.* (citing Treas. Reg. § 1.170A-14(d)(3)(ii)).

Contrary to the Commissioner's arguments, the Tax Court properly construed the plain language of I.R.C. § 170(h)(4)(A)(ii) and Treas. Reg. § 1.170A-14(d)(3)(i) and (ii). While it is true that the relatively natural habitat where a wildlife or plant community normally lives must be significant to meet the "conservation purposes" test, habitats for rare, endangered, or threatened species of animals or plants are expressly recognized as significant. Treas. Reg. § 1.170A-14(d)(3)(i) and (ii). Moreover, it was not error for the Tax Court to give the words "habitat" and "community" their plain meaning. The Tax Court properly observed that "[a] habitat denotes 'The area or environment where an organism or ecological community normally lives or occurs' or 'The place where a person or thing is most likely to be found.'" *Id.* at 281-82 (quoting American Heritage Dictionary of the English Language 786 (4th ed. 2000) and citing 7 C.F.R. § 636.3 (2002)). It also properly observed that "[a] community may be defined in this context as 'A group of plants and animals living and interacting with one another in a specific region under relatively similar environmental conditions.'" *Id.* at 282 (quoting American Heritage Dictionary of the English Language 374).

### 2.        Findings As To "Significant Relatively Natural Habitat"

We now consider whether the Tax Court clearly erred when it found that the encumbered property constituted a habitat for threatened species of animals and plants; e.g., bald eagles, Lake Huron tansy, and pitcher's thistle. We begin with the Tax Court's findings and then discuss the Commissioner's arguments.

The Tax Court found that LTC's executive director, Thomas Bailey, and Taxpayer Susan Glass, testified credibly that the encumbered property (1) "is a 'famous' roosting spot for bald eagles"; (2) "that the conservation easements establish a proper place for the growth and existence of Lake Huron tansy and pitcher's thistle"; (3) that Bailey had toured the property on various occasions and had concluded that "the habitat on the encumbered shoreline is a proper and normal environment for Lake Huron tansy, pitcher's thistle, and bald eagles"; (4) "that the staff of LTC had seen Lake Huron tansy growing on the property"; and (5) that Susan Glass had observed "Lake Huron tansy growing on the property and that she has regularly seen bald eagles there as well." *Id.* at 281. The Tax Court also found, based on evidence in the record, that "both Lake Huron tansy and

pitcher's thistle are considered threatened species which are worthy of special attention towards the goal of preservation and that LTC . . . has agreed through the conservation easements to attempt to preserve those species by giving them that special attention." *Id.* Contrary to the Commissioner's arguments on appeal, these findings are supported by the record.

The Tax Court next found that the encumbered shoreline property fell within the plain meaning of the words "habitat" and "community." *Id.* at 282. "In its natural undeveloped state, it is a 'relatively natural habitat' for a community of Lake Huron tansy, of pitcher's thistle, and of bald eagles, among other species of plants and wildlife." *Id.* This finding is supported by Mr. Bailey's testimony.

Based on these findings, the Tax Court concluded that the 1992 and 1993 Conservation Easements "protect and preserve significant natural habitats by limiting the development or use of the encumbered shoreline." *Id.* It held that Taxpayers had proved "that their contributions of the conservation easements were for a conservation purpose under section 170(h)(4), specifically, section 170(h)(4)(A)(ii)." *Id.*

The Commissioner first argues that, absent testimony that Lake Huron tansy, pitcher's thistle, or bald eagles were actually sighted living on the encumbered property at the time of the donation, the Tax Court erred when it found I.R.C. § 170(h)(4)(A)(ii) satisfied. This argument fails for two reasons. First, it ignores Ms. Glass's testimony that she had observed bald eagles and Lake Huron tansy on the encumbered property. Second, neither the plain language of the regulations nor the plain meaning of the words "habitat" or "community" support the Commissioner's argument. Although under I.R.C. § 6110(k)(3), a Private Letter Ruling cannot be used as precedent, a recent ruling provides persuasive authority for refuting the Commissioner's argument. *See* I.R.S. P.L.R. 200403044 at 9, 2004 WL 69088 (Oct. 9, 2003) (observing that, similar to the Conservation Easements at issue here, the conservation easement there "is the actual habitat for numerous plants and animal species, . . . and is potentially the habitat for several endangered, threatened or rare plant and animal species" and thus qualified "as a donation for the protection of an environmental system under § 170(h)(4)(A)(ii)").

The Commissioner next argues that, even if Lake Huron tansy, pitcher's thistle, or bald eagles did inhabit the encumbered property, the terms of the 1992 and 1993 Conservation Easements undermine their stated conservation purpose because the encumbered property is too small, Taxpayers' reserved rights are too great, and there is no limit on building on neighboring properties. Thus, the Commissioner argues, the Tax Court erred in finding that the Easements satisfied the conservation purpose test of I.R.C. § 170(h)(4)(A)(ii). We begin our analysis of this argument by examining the relevant terms of the Easements and then address the Commissioner's arguments that the terms of the Easements undermine their stated conservation purpose.

### a.      Easements' Terms

The Easements first recognize that development in the area is having a negative impact on rare and protected flora and fauna like the Huron tansy as well as wildlife habitat. They then state that their purpose is to conserve plant and wildlife habitat on the Property and provide a non-exhaustive list of prohibited and restricted list of permitted uses that do not conflict with that stated purpose. Finally, they grant to LTC rights necessary to enforce compliance consistent with their stated conservation purpose so as to protect it in perpetuity. Each Easement also provides that it "shall be liberally construed in favor of the purpose of this Conservation Easement, the [LTC], and the Conservation and Historic Preservation Easement Act, MCL 399.251, *et seq.*" JA at 125, 135 (1992 and 1993 Conservation Easements).

### (i)          Conservation Purpose, Prohibited and Permitted Uses

The stated purpose of both Easements is identical: "to ensure that the scenic and natural resource values of the Property will be retained forever. . . .  to prevent the use or development of the Property for any purpose or in any manner which conflicts with the perpetual maintenance of these scenic and natural resource values . . . ."  JA at 121, 131 (1992 and 1993 Conservation Easements).  Their provisions as to restricted uses are identical and provide that "[a]ny activity on or use of the Property that is inconsistent with the purpose of this Conservation Easement is prohibited . . . ." *Id.*  Their provisions as to permitted uses are substantially similar and both provide that Taxpayers "retain all rights . . . which are not prohibited by or inconsistent with the Purpose and other provisions" of the Conservation Easements. *Id.* at 122, 132.  The provisions as to reserved rights include further limitations.  For example, there is a limited right to prune or cut trees or shrubs to preserve the view or for safety. *Id.*  The right to "construct, maintain, repair and replace a day shelter, storage shed, scenic overlook deck, patio or similar structures" and a wooden boathouse are required to be "in a manner and location which minimizes interference with the scenic and natural resource values of the Property." *Id.*

### (ii)          Rights Granted to LTC

The Easements grant to LTC certain rights to "accomplish the purpose of and to assure compliance with" the Easements' stated purpose.  These include the right to enter the Property "to monitor compliance. . . , to enforce the terms of this Conservation Easement . . . , to undertake corrective action on the Property in the event of a violation . . . .  to prevent any activity on or use of the Property that is or may be inconsistent with the provisions . . . and to require restoration of all areas or features of the Property damaged by such activity or use. . . ." *Id.* at 123, 133.  The easements also grant LTC extensive enforcement rights, including legal action against Taxpayers or any subsequent landowner who violates their terms and the right to be reimbursed for "all reasonable costs incurred as a result of noncompliance," including attorneys fees and restoration costs. *Id.*

### b.          Stated Conservation Purpose Is Not Undermined

Contrary to the Commissioner's arguments here, the 1992 and 1993 Conservation Easements are carefully drawn to prohibit any activity or use of the encumbered property that would undermine their stated conservation purpose.  First, there is no evidence that LTC is unwilling or unable to monitor and enforce compliance so as to maintain the stated conservation purpose in perpetuity.

Second, each reserved right is carefully limited so as to ensure that the identified plant and wildlife habitats on the encumbered property remain protected.  For example, the right to selectively prune, trim or cut trees, shrubs or vegetation is for the limited purposes of preserving the scenic view or for safety.  Clear-cutting is expressly prohibited.  The plant species identified as requiring habitat protection, Lake Huron tansy and pitcher's thistle, are both only a few feet high.  Thus, view and safety are unlikely to require pruning or cutting that would undermine preservation of their habitat.  Furthermore, the limited right to construct or maintain a shed, boathouse, or deck is required to be done in a manner and location that minimizes interference with the identified plant and wildlife habitat, and this right is subject to LTC's right to preclude any such construction if it is found to be inconsistent with the Easements' conservation purpose.  Finally, the right to maintain and establish foot paths enhance rather than diminish the ability of these plant and wildlife habitats to flourish.  Just as foot paths are used in State and National Parks to conserve natural habitats, they are useful on the encumbered property to stop people from trampling the very plants sought to be protected and from jeopardizing the structural integrity of the delicate Lake Michigan bluff.

Credible testimony confirmed that Taxpayers' reserved rights were consistent with the Easements' stated purpose of protecting threatened plant and wildlife habitats, and the Commissioner failed to present evidence to the contrary. As the Treasury Regulations clarify, the prohibition on inconsistent use "is not intended to prohibit uses of the property, . . . if, under the circumstances, those uses do not impair significant conservation interests." Treas. Reg. § 1.170A-14(e)(2). The Tax Court properly found that the reserved rights in the 1992 and 1993 Conservation Easements do not impair the significant conservation interests they were designed to protect.

The Commissioner's argument, that the relatively small size of the encumbered property changes this conclusion, is not supported by the facts or the law. The Commissioner failed to present any testimony or other evidence supporting the conclusion that, given Taxpayers' retained rights, the identified plant and wildlife habitat cannot exist in an area the size of the encumbered property or that the conservation interests the Easements were designed to protect would be impermissibly impaired. Moreover, as the Commissioner concedes, there is no provision in I.R.C. § 170(h) or the implementing regulations that requires a minimum size for a qualifying conservation contribution. In fact, a Private Letter Ruling from the Internal Revenue Service allowing the deduction under I.R.C. § 170(h) for a conservation easement on a 3/4 acre parcel with a stated conservation purpose of preserving "scenic enjoyment of the general public" provides persuasive authority to the contrary. *See* I.R.S. P.L.R. 8546112 at 4-5, 1985 WL 297172 (Aug. 21, 1985). It is not the size of the Conservation Easement that matters; rather, it is whether any retained use undermines its stated conservation purpose.

The Commissioner also argues that the Tax Court erred by not considering the building rights of neighboring property owners. This argument similarly fails. There is no statutory or regulatory provision requiring consideration of neighboring property owners' building rights when determining whether a conservation easement is a "qualified conservation contribution." Congress likely recognized the common sense truth that Taxpayers/Donors cannot realistically limit building on property outside of their control. Adoption of the Commissioner's position would unnecessarily preclude conservation donations permitted under the Tax Code. It would also preclude larger conservation benefits achieved by aggregate donations of relatively small conservation easements, each serving their own stated conservation purpose. As discussed above, the terms of the 1992 and 1993 Conservation Easements are consistent with the conservation purpose for which they were created – the protection and preservation of threatened plant and wildlife habitats from the increased development that led to the conservation donation in the first instance.

Finally, the Commissioner's reliance on *Turner v. Commissioner*, 126 T.C. 299 (2006), is misplaced. Although a portion of Taxpayers encumbered property is already protected by Emmet County's 60-foot setback requirement, the Easements in essence double that protection to 120 feet. Unlike the facts in *Turner*, here there is no evidence in the record that this set-back requirement or building on adjacent properties precludes Taxpayers from satisfying the natural habitat requirements of I.R.C. § 170(h). In *Turner*, the Tax Court expressly distinguished the decision in *Glass* because in *Turner* the issue was whether the taxpayers had satisfied the open space requirement of section 170(h). "Satisfaction of this requirement requires both the preservation of open space and the incurement of a significant public benefit." *Id.* at 313 (citing I.R.C. § 170(h)(4)(A)(iii)). As the *Turner* Court observed, these requirements are different than those that had to be satisfied in *Glass*. *Id.*

The Tax Court did not err when it found that the 1992 and 1993 Conservation Easements "protect and preserve significant natural habitats by limiting the development or use of the encumbered shoreline" and held that Taxpayers had proved "that their contributions of the conservation easements were for a conservation purpose under section 170(h)(4), specifically, section 170(h)(4)(A)(ii)." *Glass*, 124 T.C. at 282.

### 3.        Conservation Purpose Is Protected In Perpetuity

We now address the Commissioner's argument that the Tax Court erred in finding that the Taxpayers' deductions were "exclusively for conservation purposes" as required under I.R.C. § 170(h)(5)(A) and Treas. Reg. § 1.170A-14(e), (g).  Section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." I.R.C. § 170(h)(5)(A).  The Treasury Regulations implementing § 170(h)(5)(A) reference subsections 1.170A-14(g)(1) through (g)(6)(ii) and provide that "a donation must be exclusively for conservation purposes." Treas. Reg. § 1.170A-14(e)(1). They also address inconsistent uses and clarify that the requirement that a donation be exclusively for conservation purposes "is not intended to prohibit uses of the property, . . . if, under the circumstances, those uses do not impair significant conservation interests." Treas. Reg. § 1.170A-14(e)(2).  Pre-existing uses of the property are likewise permitted if they do not "conflict with the conservation purposes of the gift." Treas. Reg. § 1.170A-14(e)(3).

Subsections 1.170A-14(g)(1) through (g)(6)(ii), referenced in § 1.170A-14(e)(1), also address inconsistent uses and emphasize the donee's ability to prevent the donor or his successor's use of retained rights in a manner that is inconsistent with the donation's conservation purposes. For example, the donor's retained rights in the encumbered property "must be subject to enforceable restrictions (for example, by recordation in the land records of the jurisdiction in which the property is located) that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation. . . ." Treas. Reg. § 1.170A-14(g)(1).  If the donated property interest is subject to a mortgage, the mortgagee must subordinate "its rights in the property to the right of the qualified organization to enforce the conservation purposes of the gift in perpetuity. . . ." Treas. Reg. § 1.170A-14(g)(2).  If the donor retains any rights in the encumbered property that "may impair the conservation interests," the donor must provide the donee with "documentation sufficient to establish the condition of the property at the time of the gift" and "designed to protect the conservation interests associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of reserved rights . . . ." Treas. Reg. § 1.170A-14(g)(5)(i).  Moreover, "[t]he terms of the donation must provide a right of the donee to enter the property at all reasonable times for the purpose of inspecting the property to determine if there is compliance" and "the terms of the donation must provide a right of the donee to enforce the conservation restrictions by appropriate legal proceedings, including but not limited to, the right to require the restoration of the property to its condition at the time of the donation." Treas. Reg. § 1.170A-14(g)(5)(ii).  Finally, if unforeseen consequences make it "impossible or impractical" to continue using the encumbered property for conservation purposes, "the conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceedings and all of the donee's proceeds . . . from a subsequent sale or exchange of property are used by the donee organization in a manner consistent with the conservation purposes of the original contribution." Treas. Reg. § 1.170A-14(g)(6)(i).

Contrary to the Commissioner's arguments here, the Tax Court properly construed I.R.C. § 170(h)(5) as requiring a donee like LTC to hold the qualified real property interest "in perpetuity exclusively for one or more of the conservation purposes listed in section 170(h)(4)." *Glass*, 124 T.C. at 282.  It thoroughly examined the terms of the 1992 and 1993 Conservation Easements, the trial testimony, and the statutory requirements and correctly concluded that Taxpayers' contributions met the "exclusively for conservation purposes" requirement of I.R.C. § 170(h)(5). *Id.* at 283-84.

### III.   Conclusion

The Tax Court's factual findings, that the terms of the 1992 and 1993 Conservation Easements do not allow Taxpayers to use their retained rights in the encumbered property in a way that undermines the Easements' conservation purpose of protecting a threatened natural habitat of

wildlife and plants in perpetuity, are not clearly erroneous. Moreover, its construction of I.R.C. § 170(h)(4) and (5) and the Treasury Regulations implementing those statutory provisions is correct. The Tax Court's decision is AFFIRMED.